**FIRST NAT. BANK OF TULSA, OKL., v. HOOVER et al. (No. 2370.)**

(Court of Civil Appeals of Texas. Amarillo. Jan. 28, 1925. Rehearing Denied Feb. 25, 1925.)

1. **Banks and banking** ⊚�ネ283—**New corporation is answerable for debts of constituent corporations on consolidation of national banks.**

Under U. S. Comp. St. Ann. Supp. 1919, § 9696a, authorizing consolidation of national banks new corporation is answerable for liabilities of constituent corporations whether arising ex contractu or ex delicto.

2. **Banks and banking** ⊚⟻283—**Knowledge of old bank on consolidation chargeable to new bank.**

On consolidation of national banks under U. S. Comp. St. Ann. Supp. 1919, § 9696a, knowledge of old bank as to rights of parties to securities transferred is chargeable in law to new bank.

3. **Chattel mortgages** ⊚⟻229(3) — **Evidence held to sustain finding that mortgagor was indebted for pasturage on mortgaged calves to another.**

In action on note by holder in due course for balance due and foreclosure of mortgage on calves after they had been sold by mortgagor to defendant, evidence *held* to sustain finding that, when defendant purchased calves from mortgagor, mortgagor was indebted to another for pasturage thereon.

4. **Chattel mortgages** ⊚⟻229(3)—**Finding that holder of note secured by chattel mortgage on calves consented that pasturage bill due defendant and another should be deducted by defendant from sale price of cattle sustained.**

Evidence *held* to sustain finding that bank holding note secured by chattel mortgage on calves sold by mortgagor to defendant consented that pasturage bill due defendant and another for which defendant had a lien under Rev. St. art. 5664 on such calves should be deducted by defendant from sale price thereof.

5. **Appeal and error** ⊚⟻930(3)—**Trial court presumed to have found unsubmitted issue to support verdict was sustained by evidence.**

Where evidence was sufficient to sustain finding that defendant exercised good faith in purchasing calves subject to chattel mortgage in favor of bank, and no issue was given to jury or tendered to court by bank questioning

good faith of defendant in transaction it would be presumed that trial court found such issue favorably to defendant, in view of Rev. St. art. 1985.

**6. Evidence &#9882;&#8212;271(7)—Self-serving declarations of bank officer held properly excluded.**

Where bank holding note secured by chattel mortgage on calves sold by mortgagor to defendant stated in letter that it understood that pasturage was to come out of sale price, self-serving declarations of bank officer as to meaning of letter were properly excluded.

**7. Chattel mortgages &#9882;&#8212;219—Bank's mistake in misunderstanding defendant's letter as to deductions for pasturage on calves sold to him held no defense.**

That bank, holding note secured by chattel mortgage on calves sold by mortgagor to defendant, did not understand that defendant's offer to purchase included not only deductions for pasturage bill due himself, but also that due another, was no defense for bank, in absence of fraud on defendant's part.

**8. Chattel mortgages &#9882;&#8212;219—Bank bound by letter where contemplating that defendant should act on it.**

Bank which held note secured by chattel mortgage on calves sold by mortgagor to defendant was bound by letter authorizing defendant to deduct from purchase price both pasturage bill due himself and another, where it contemplated that he should act on it.

Appeal from District Court, Hemphill County; W. R. Ewing, Judge.

Action by the First National Bank of Tulsa, Okl., against H. E. Hoover and others. Judgment for defendants, and plaintiff appeals. Affirmed.

J. W. Sanders, of Canadian, for appellant.

Frank Willis and Hoover & Willis, all of Canadian, for appellees.

RANDOLPH, J. This is a second appeal in this case. For opinion on former appeal see 244 S. W. 1046.

Appellant, as plaintiff, filed this suit in the district court of Hemphill county, Tex., on July 25, 1921, alleging, substantially: That on or about the 15th day of April, 1920, T. V. Elzey executed and delivered to the Union National Bank of Tulsa, Okl., a series of notes as follows: Two notes each for $5,000, due August 1, 1920; three notes each for $5,000, due October 1, 1920; one note for $3,300, due October 1, 1920; and one note for $2,500, due October 1, 1920, all bearing date April 15, 1920, executed by T. V. Elzey, and payable to the Union National Bank of Tulsa, Okl., bearing interest from maturity at the rate of 10 per cent. per annum. That on the same day defendant executed and delivered to said Union National Bank, as collateral security to the payment of said notes, a chattel mortgage upon certain live stock, describing said stock; also setting out certain

terms of the mortgage which provides for a renewal of the notes, or extension of the time of payment, and alleging the registration of such mortgage on April 19, 1920, and, further, that, in accordance with the terms' of said chattel mortgage, the parties, on the 22d day of November, 1920, did renew the indebtedness above described which then remained unpaid, and setting out such renewal note (for the sum of $942.48) in hæc verba. Further alleging that prior to the execution and delivery of said renewal note the live stock described in said mortgage had been applied on said indebtedness, except 50 head of steers, giving the brand, which 50 head are alleged to be the remainder of the 150 head of white face calves described in the mortgage. The said Elzey sold said 50 head of calves described in said mortgage to H. E. Hoover, and as a part of the consideration for such sale that Hoover assumed the payment of the residue of the original debt evidenced by the renewal note, and that Hoover was then in possession of said 50 head of calves. That plaintiff, by due and legal transfer, in due course, became the legal and equitable owner and holder of said last described promissory note, and prays for judgment against defendants Elzey and Hoover for the principal, interest, and attorney's fee due on said note.

Defendant Hoover, by his second amended original answer, upon which the case went to trial, excepts generally and specially. After general denial, he alleges, in substance, that long prior to the execution of the note sued on he purchased 50 head of calves from Elzey with the knowledge and consent of the Union National Bank, the payee in the note sued on, and paid for same by check, less pasturage charge, which pasturage charge was deducted from the purchase price of the calves, with the knowledge and consent of the Union National Bank; that, if Elzey ever gave a mortgage upon these calves, the same was given and received in fraud, at a time said Elzey and said bank well knew that the calves had been sold and delivered to defendant, and that such renewal or mortgage was given without the knowledge or consent of defendant, and alleging the facts to be as follows: That Elzey offered to sell him certain calves, representing that the calves were all early spring white face calves; that, after inspecting the calves, he found them not as represented, and notified Elzey's agent that he would not purchase them, and forbade them from removing them from his, Hoover's, pasture, until the pasture charges were paid; that under later negotiations he finally purchased the calves, because the Union National Bank agreed that the pasture charges might be deducted from the price of the calves; that he held his own pasture charges, and a Moody pasture charge against the calves; that he notified the bank

that he held pasture charges against the calves, and that the bank advised him to accept the calves, deducting the pasture charges and remit the balance, which he did; that the balance due on the calves after deducting the pasture charges was $160.85, which amount he immediately sent to the bank after accepting the calves, and which the bank retained, long prior to the date of the execution of the renewal note.

Defendant Hoover also pleaded that, owing to the sale of the calves, the Union National Bank extended the date of payment on the original indebtedness without the knowledge or consent of defendant Hoover; that at the time the defendant Hoover was considering the purchase of said calves Elzey was indebted to Thomas F. Moody and to defendant Hoover for pasturage on said cattle, with other cattle, upon which said Union National Bank held a mortgage; that said Thomas F. Moody and defendant Hoover each had and held a pasturage lien against said cattle; that said Elzey had removed the said cattle from the pasture of said Moody without said Moody's consent and said Moody was asserting his lien on and against said cattle; that said Moody assigned a portion of his debt against said cattle and other cattle upon which said Union National Bank held a mortgage to the defendant Hoover for the consideration of the payment of such amount by defendant Hoover to Moody; that said Moody's pasturage debt assigned to this defendant amounted to the sum of $942.48; that defendant Hoover, relying upon the consent of the sale of said calves to be made to him, and in order to collect his pasturage charges held by him, and relying on the consent of the bank that he might deduct said charges, thereupon concluded the purchase of the 50 head of calves from Elzey, and expressly denying that he had ever assumed the payment of the renewal note sued on.

In its third supplemental petition, by way of replication to defendant's special answer, plaintiff pleads innocent purchase of the renewal note sued on for a valuable consideration, without notice of any transactions between Elzey and defendant Hoover and between Elzey and the Union National Bank, and, by trial amendment, alleges the disposition of the cattle by Hoover, and prays for a personal judgment against Hoover.

The following is a brief statement of the facts introduced in evidence explanatory of the case as submitted to the jury:

Hoover was the owner of a pasture in Ochiltree county. Elzey owned cattle upon which the Union National Bank of Tulsa, Okl., had a mortgage to secure the payment of the notes described in plaintiff's petition. In June, 1920, Hoover agreed to buy 50 head of the cattle, being 50 head of calves, upon the representation of Elzey that they were early white face calves. Said calves were to be de-

livered to Hoover the 15th of September thereafter. It seems that Elzey had placed his cattle in Hoover's pasture in June, 1920, between 300 and 400 head, for which he was to pay 75 cents per head per month pasturage, not counting the calves. These cattle were a part of the cattle that were covered by the Union National Bank's mortgage. Elzey's man Houston, about the 1st of October, 1920, notified Hoover that he was ready to deliver the calves. Hoover went out to his ranch to receive them, but refused to do so for the reason that they were not such calves as he had bought, they being small, late calves, and some of them had the appearance of being "dogies," and at this time he notified Elzey's man not to move the cattle from the ranch until the pasturage was paid. Hoover, following this, had no further negotiations with Elzey concerning the calves until the receipt by him of the following wire from the Union National Bank on the 3d day of October, 1920:

"Tulsa, Okl., 12:05 P. H. E. Hoover. Advise regarding payment due us from you on Elzey cattle. Union National Bank."

To this telegram defendant replied by letter as follows:

"Canadian, Tex., October 6, 1920.

"Union National Bank, Tulsa, Okl.—Gentlemen: Have your wire of 3d. Have been absent, hence delay. The Elzey cattle have not been delivered. Will be delivered between the 15th and first. Did not know I was due you any payment on these cattle. Have orders covering pasturage bill for something like $1,000.00.

"Yours truly,             H. E. Hoover."

The bank replied to this by letter dated October 11, 1920, as follows:

"We are in receipt of your letter of the 6th in reply to our wire of 3d. We were advised that payment would be made us for the cattle which Mr. Elzey sold to you on or about the 1st of October, hence our wire to you. We understand that there was pasturage to come out of this. We trust that we shall receive your check for the balance about the 15th, the time of delivery.

"Very truly yours,

"W. John, Vice President."

Hoover testifies that on receipt of this last letter he concluded to take the 50 calves at $36 per head, because it would enable him to get the Moody pasture bill, and thereupon closed the trade for said calves, and on the 18th of October, 1920, wrote the Union National Bank as follows:

"Inclosed please find my check for the sum of $160.85 balance due Mr. T. V. Elzey for 50 calves which I purchased from him. The calves were $36.00 per head—$1,800.00. From this amount I made the following deductions: Order from Thomas F. Moody pasturage on cattle for which amount I have credited him, $942.48; pasturage bill due myself, $696.67, total $1,-

639.15; balance due for which check is inclosed $160.85.

"Yours truly,          H. E. Hoover."

The bank cashed this check on its receipt, and then declined to allow the Moody pasturage bill. After the purchase and remittance by Hoover, the Union National Bank took from Elzey a renewal note which is the note sued on in this case, representing that this was the balance which Elzey owed on the original debt evidenced by the original notes first above set out, and this renewal was made without Hoover's knowledge and consent.

The plaintiff's officials testified that they did not know anything about the Moody pasturage bill; that it was an innocent purchaser in good faith of the note for a valuable consideration and without any notice of any of the transactions between the defendants and the Union National Bank. The nature of the transaction in which the alleged purchase of the note by plaintiff from the Union National Bank is disclosed by the following evidence:

A. W. Hurley was vice president of the First National Bank of Tulsa, Okl., during the period of time between November 22, 1920, and January 10, 1921, and testifies he had personal knowledge as to how the renewal note came into possession of the First National Bank, plaintiff. This knowledge was gained by being one of the officers who negotiated a consolidation of the Union National Bank with plaintiff bank on January 1, 1920. The renewal note sued on was one of the notes among the assets of the Union National Bank which was purchased on January 1, 1921, from the Union National Bank. The following officers of the First National Bank of Tulsa, Okl., constituted a committee to check over all notes and other assets of the Union National Bank, among the notes and other assets was the renewal note, G. R. McCullough, president; A. E. Bradshaw, vice president.

A. W. Hurley, vice president of the First National Bank, testified that he was one of the officers who negotiated the consolidation of the Union National Bank with the First National Bank on January 1, 1921, and that the Elzey note for $942.48 above described was one of the notes among the assets of the Union National Bank which was purchased on January 1, 1921. Nothing was said in the negotiations concerning the connection of H. E. Hoover with this note or any agreement between Mr. Hoover and Mr. Elzey or Mr. Willard John of the Union National Bank of Tulsa; nothing was ever heard of any transaction any more than the purchase of the note until the note was not paid and suit was brought; all that he knew of the transaction was that the payment of the note was not made of due date; that they had paid $942.48 for said note.

Appellant's first proposition raises the question that a "bona fide purchaser of a negotiable note, in due course, and for value, is not affected by equities existing between or among prior parties to the note, or to the note of which note is renewal and extension," and cites the following authorities as sustaining the proposition: People's Sav. Bank v. Bates, 120 U. S. 556, 557, 7 S. Ct. 679, 30 L. Ed. 754; Nunn v. Padgitt (Tex. Civ. App.) 161 S. W. 921, 11 C. J. 667 (423), 668 (424), 670; Weeks v. Bank (Tex. Civ. App.) 207 S. W. 973; Wynne v. Admire (Tex. Civ. App.) 23 S. W. 418.

The proposition is a sound one, and, if the evidence established the plaintiff's plea that it was an innocent purchaser in good faith, for a valuable consideration and without notice of the claims of defendant Hoover, it should be sustained.

Appellee Hoover by his counter proposition asserts that the plaintiff was not an innocent purchaser for value and without notice, but that by the consolidation of the Union National Bank with the First National Bank the plaintiff bank took over the assets of the old banks subject to all existing obligations of the banks so consolidated as if no change had taken place, and that all knowledge of the old banks as to the rights of the parties to the securities transferred is chargeable to the new bank.

[1] Section 9696a, U. S. Compiled Statutes, 1919 Supplement, authorizes the consolidation of national banks. Under such consolidation the new corporation is answerable for the debts, obligations, and liabilities of the constituent corporations (Bonnet v. First National Bank, 24 Tex. Civ. App. 613, 60 S. W. 325; 14a C. J. § 3695), and this, too, whether arising ex contractu or ex delicto.

[2] Under such consolidation, the knowledge of the old bank as to the rights of the parties to the securities transferred is chargeable in law on the new bank. Lanier et al. v. Nash et al., 121 U. S. 404, 410, 7 S. Ct. 919, 30 L. Ed. 947.

Chief Justice Huff, speaking for this court in the case of Texas Seed & Floral Co. v. Chicago Set & Seed Co., 187 S. W. 752, lays down the following as the principle controlling consolidation of corporations to be:

"The mere purchase of franchise, etc., by one corporation, of that of another, does not constitute a consolidation, but this case presents a consolidation of two corporations, who are the constituents of the new, thereby vesting it with all the rights, property, and immunities of both. This should it appears to us be sufficient, with the other facts in this case, to show an implied promise to pay the obligations of the old, whose representative it is in name and in law,"

—and quotes with approval from the case of Atlantic & Birmingham Ry. Co. v. Emma Johnson, 127 Ga. 392, 56 S. E. 482, 11 L. R. A. (N. S.) 1119, wherein it is held:

"Where, however, there is an absorption of the business and assets—in other words a merger de facto—by either a corporation formed for the purpose, or one already in business, the liability of the corporation receiving the assets is rested upon the familiar trust fund doctrine. Since such receiving corporation does not stand as a bona fide purchaser for value, in such case the extent of the liability is necessarily determined by the value of the property received."

In the case of Houston & T. C. Ry. Co. v. Shirley, 54 Tex. 137, it is held that a voluntary agreement to consolidate renders the new corporation liable for the obligations of the old, and such new corporation may be sued under its new name for the debts owing by the old corporation as if no change had been made in the name or organization of the original corporations, and the court says:

"Evidently such a consolidation cannot be accomplished in disregard of the rights of creditors or stockholders, and accordingly either in the statute authorizing or in the agreement consummating such consolidation, stipulations are inserted for the protection of those rights. And, even if neither statute nor agreement make mention of creditors, the consolidated corporation is held to have assumed the liabilities of its constituents."

See, also, Washington L. Ins. Co. v. Lovejoy (Tex. Civ. App.) 149 S. W. 398, 406.

It would be unconscionable to allow a corporation to consolidate with another and take over the assets and property of the other without any liability for the debts of the old corporation. This being true, it would be just as reprehensible for equity to permit the absorption of the property and assets of such corporation and then permit the absorbing corporation to escape liability for the acts or conduct of the old corporation with reference to the very securities, assets, and property that it takes over by presenting its equitable plea of innocent purchaser. We therefore overrule this proposition and the assignment upon which it is based.

The plaintiff not being an innocent purchaser, the controlling question presented by the record is: Was Hoover, under the bank's letter and the facts and circumstances surrounding the transaction of the purchase of the calves, authorized to rely on such letter, and was he protected by its terms in his action in deducting the Moody pasture bill?

Issue No. 1 submitted by the trial court to the jury is as follows: "Did the Union National Bank of Tulsa, Okl., agree that Elzey should sell to defendant Hoover the 50 head of calves in question in this case on condition that Hoover should deduct from the purchase price of said calves the amount of pasturage bills and order for pasturage bills that he, Hoover, held against the Elzey cattle, and remit the balance to the said Union National Bank?" To which the jury replied,

"Yes." Issue No. 3, submitted, is as follows: "Did the Union National Bank of Tulsa, Okl., with full knowledge of all the facts and circumstances in connection with said sale, consent to the sale of the calves in controversy to Hoover?" Which the jury answered, "Yes." The jury also found that at the time Hoover bought the calves from Elzey Elzey was indebted to Moody in the sum of $942.48.

[3] Before proceeding with the discussion of Hoover's right to rely on, and of his reliance on, the letter from the bank, we will dispose of another question raised by the record. Appellant attacks the verdict or finding of the jury upon the question of Elzey's indebtedness to Moody as being based upon no proof of the fact. Moody and his secretary both testify that Elzey was so indebted. Elzey testifies that he had had a settlement with Moody and that he owed Moody nothing. When this settlement was had, whether before or after Hoover's receipt of the order from Moody, does not clearly appear. Moody, under cross-examination, admits that during the period of time which he was asked about that his mental condition was such that he would not say but that it was possible that such settlement was had. Under the finding of the jury we cannot say that it was not supported by some evidence; hence the fact of indebtedness or no indebtedness is settled adversely to appellant's contention, but, if it was not so settled, then in view of the pleadings and evidence as to Hoover's action on receipt of the letter and his reliance on the letter, and closing the trade, this question thus becomes immaterial.

The effect of the plaintiff's suit is to permit the deduction from the purchase price of the calves of Hoover's individual pasturage bill and the rejection of the deduction of the Moody pasture bill. Issue No. 1 presents to the jury both the pasture bill and order for pasture bill, and by their findings they say that the Union National Bank consented that both should be deducted by Hoover. Is this finding sustained by any evidence? We think so.

[4] The pasturage due Hoover was a lien upon the cattle in his pasture. Article 5664, Rev. Civ. Statutes of Tex. Hoover had instructed Elzey not to remove the cattle until the pasturage was paid; hence Hoover was not in a position to be doubtful of, or anxious for the payment of, his individual bill for pasturage. He did have an order for another pasturage bill, owing to another man, about the payment of which he would naturally have had some doubts. When he writes to the Union National Bank he voices this doubt by informing them that the cattle have not been delivered; that he did not know that he owed them anything; that the cattle would not be delivered until the 15th

of October; and that he held an order for a pasturage bill for something near $1,000, and upon this information thus furnished it the Union National Bank in its reply admitted that it knew that pasturage charges are to be deducted, and advise Hoover that when this had been done to remit it the balance of the purchase price. Hoover testifies that upon receipt of this letter he concluded to take the cattle even if they were not such as he had contracted for. He took the cattle, closed the trade, and remitted the balance to the Union National Bank, less his pasturage bill and the order for pasturage. Under this statement we have no authority to disturb the verdict of the jury.

[5] There was no issue given to the jury or tendered to the court by appellant questioning the good faith of Hoover in the transaction, and no error is assigned upon his want of good faith in the transaction or in relying upon the letter from the Union National Bank as authority for deducting both the pasture bill and the order for pasturage and closing the purchase of the calves, and we must presume that the trial court found those issues favorably to Hoover. Article 1985, Rev. Civ. Statutes of Tex.; El Paso Electric Co. v. Carruth (Tex. Civ. App.) 208 S. W. 986; Panhandle & S. F. Ry. Co. v. Huckabee (Tex. Civ. App.) 207 S. W. 331; Moore v. Pierson, 100 Tex. 113, 94 S. W. 1132.

[6] The bank's intention in writing the letter is not the question for solution. The question is, What construction was Hoover, by the terms of the letter and the facts and circumstances surrounding the transaction of sale of calves, authorized to put on it. The jury was not required to ascertain the intention of the bank in writing the letter through self-serving declarations made after Hoover had acted upon such letter. The bank in the letter stated that it understood that there was pasturage to come out of this sale price, and the trial court correctly excluded the testimony of W. John, vice president of the Union National Bank, that by this language he "referred to the pasturage for the summer months of 1920 on the cattle Mr. Elzey had sold to Mr. Hoover. I secured my information from Mr. Elzey who told me that he did not have the money to pay the pasturage for the summer months of 1920 due on the 50 head of calves he sold to Hoover, so I agreed to allow the pasture bill for the summer months on the 50 head of calves to be deducted from the remittance for the calves sold," because, as stated above, the question was one of reasonable construction of the language used in the letter under the facts and circumstances. (By way of

parenthesis, the writer wishes to observe that Hoover was charging on all the cattle of Elzey that he had in his pasture 75 cents per month per head for the grown cattle, and the calves were grazed free. If he charged 75 cents per month on the 50 calves that he bought from Elzer, his bill for the summer months would only amount to something over $100. Hence his announcement in his letter to the bank that he had an order for a pasture bill of something near $1,000 ought to have excited some curiosity in the mind of the man who testifies that he intended to pay only the pasture bill on the 50 head of calves for the summer months.)

[7] That the bank did not understand Hoover's letter to include the Moody bill, there being no fraud on Hoover's part, is no justification or defense for the bank. 1 Elliott on Contracts, § 110. Unless the bank was abundantly satisfied with the statement contained in the letter, before sending the letter to Hoover it should have inquired what "orders for pasturage" he was referring to instead of assuming that he referred to the pasturage for the 50 head of calves for the summer months.

When Hoover notified the bank that he held an order for pasturage for nearly $1,000, and it consented to his closing the trade, and instructed him to remit the balance to it, the bank intended, as found by the jury, to accept the proposition contained in its letter, which he did. Dunn v. Price, 87 Tex. 321, 28 S. W. 681. In this cited case, Dunn v. Price, the Supreme Court approves the rule laid down in Smith v. Hughes, L. R. 6 Q. B. 607:

"If, whatever a man's real intention may be, he so conducts himself that a reasonable man would believe that he was assenting to the terms proposed by the other party, and that other party upon the belief enters into the contract with him, the man thus conducting himself would be equally bound as if he had intended to agree to the other party's terms."

[8] The Union National Bank evidently wrote the letter to Hoover with the full intention of it being acted upon and of being bound thereby. This is the purport of the language used in it. It was contemplated that Hoover should act upon it, and the bank was thereby bound. Johnson v. Bailey, 79 Tex. 518, 15 S. W. 499.

We feel that our views upon the questions discussed in this case conclude the appellant's propositions against it as our rulings in the case cover the material propositions and assignments presented by appellant, and all assignments and propositions are overruled and the judgment of the trial court affirmed.