NORTHWEST BANCORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 69789. Promulgated October 10, 1935.

*Peter S. Rask, Esq., P. J. Coffey, Esq.,* and *Hayner N. Larson, Esq.,* for the petitioner.

*Shelby S. Faulkner, Esq.,* for the respondent.

OPINION.

MURDOCK: The Commissioner determined a deficiency of $38,-497.90 in income tax of the petitioner for the calendar year 1929, based upon a consolidated return which included income and deductions of the Iowa-Des Moines National Bank & Trust Co. for the period September 28 to December 31, 1929. The petitioner assigns as error the action of the Commissioner in (1) disallowing $524,412.48 as a deduction for the Iowa-Des Moines National Bank & Trust Co. representing a loss from the sale of real estate, bonds, stock, and notes which were sold at their total book value, which value was $524,412.48 less than their cost to prior owners; (2) in disallowing "the net loss or prior year loss of the Iowa National Bank of Des

Moines, whose name was changed to the Iowa-Des Moines National Bank and Trust Company, in the sum of $216,645.90 "; and (3) " in finding that petitioner was affiliated with the Iowa-Des Moines National Bank & Trust Company on September 29th, 1929." The parties have stipulated practically all of the facts in the record which are material to decision of the issues raised.

The petitioner is the parent corporation of a large group of corporations, most of which are banks. The Iowa National Bank and Des Moines National Bank were national banks located in Des Moines. The Des Moines Savings Bank & Trust Co. was a state bank located in the same city. The petitioner began negotiations in July 1929 to have the three Des Moines banks combine into one bank and to acquire most of the stock of the one bank after the combination had been effected. A plan was adopted to accomplish the desired result and that plan was carried out. The three banks combined under the name of " Iowa-Des Moines National Bank and Trust Company." The petitioner became the owner of all but directors' qualifying shares of that bank. The parties have stipulated, *inter alia*, " That said banks were duly combined pursuant to an agreement of consolidation * * * dated August 20th, 1929, under the Charter of the Iowa National Bank of Des Moines, Iowa, under the title of the ' Iowa-Des Moines National Bank and Trust Company ', pursuant to and in accordance with the provisions of an Act of the Congress of the United States, entitled ' An Act to provide for the Consolidation of National Banking Associations ', approved on the 7th day of November, 1918, and amended on the 25th day of February, 1927, and said merger was effected after the close of business on September 20th, 1929." The agreement provided that the three banks " are hereby consolidated under the charter of the said first named bank [Iowa National Bank] as hereby modified and the articles of association of said first named bank are hereby amended so as to conform with this agreement." The capital stock was increased from $1,200,000 (12,000 shares of $100 par) to $2,000,000 (20,000 shares of $100 par). " On the date of consolidation its surplus shall be $1,000,000 and its undivided profits not less than $500,000." Twelve thousand shares of the new stock were " allotted " share for share to the stockholders of the Iowa National Bank, 3,333⅓ shares were " allotted " to the stockholders of the Des Moines National Bank in the ratio of one-third share of new for one share of old, and 4,000 shares were " allotted " share for share to the stockholders of the Des Moines Savings Bank & Trust Co. Five hundred shares were to be purchased at $200 per share by the stockholders of the Iowa National Bank and 166⅔ shares were to be purchased at $200 per share by the stockholders of the Des Moines Savings Bank & Trust Co. The Iowa National Bank was to furnish

acceptable net assets of $2,065,000 above all liabilities, the Des Moines National Bank, $641,666.67, and the trust company, $660,000. Assets of any bank deemed undesirable or unnecessary were to be transferred in trust for the benefit of the respective shareholders prior to the effective date of the " consolidation." Any shortage in the amount to be furnished by any bank was to be paid in cash by the stockholders of that bank. The " consolidation " was to " become effective " when ratified by certain percentages of the stockholders of the three combining banks and when it " shall have been approved by the Comptroller of the Currency of the United States." The Comptroller of the Currency, under date of September 20, 1929, certified that the three banks " have been consolidated under the charter of The Iowa National Bank of Des Moines and under the corporate title of ' Iowa-Des Moines National Bank and Trust Company ' with capital stock of Two MILLION DOLLARS ($2,000,000) and that the consolidation is hereby approved." The requisite number of stockholders of the three banks indicated their ratification and consent by vote on August 24, 1929. The board of directors of the Iowa-Des Moines National Bank & Trust Co. met on September 20, 1929, and elected officers.

The petitioner entered into a contract dated August 21, 1929, with " such of the Shareholders " of the three banks, " which Consolidating Banks are proposed to be merged into one new bank, as shall become parties hereto by executing this Agreement, or any counterpart thereof, and, or by depositing their stock for sale or exchange hereunder." Paragraph 2 of the agreement is as follows:

2. At the present time, it is contemplated that the Consolidating Banks will be merged into a bank to be known as the " Iowa-Des Moines National Bank & Trust Company " under a reorganization plan which will enable each Stockholder of the Consolidating Banks to receive stock in the New Bank, upon a basis set out in said merger plan. The Shareholders agree that they will deliver the shares of stock which they now own in said three banks, endorsed in blank, to the Iowa National Bank to be held by said Bank in escrow, for the purpose of depositing the same under said merger or consolidation plan; that they will vote said stock on behalf of the Shareholders in favor of said merger and that when and as said merger has been consummated and the shares of stock in the New Bank has been issued, said shares of stock in the New Bank shall be issued to the Company [the petitioner] and shall be delivered to the Company for sale or exchange as hereinafter provided.

The following is a part of paragraph 3:

3. Each Shareholder hereby agrees to sell to the Company or exchange the shares of stock in the New Bank which he receives on one or other of the following bases, i. e.:
    (a) Four and one-half (4½) shares of stock of the Company or
    (b) Three Hundred Fifteen Dollars ($315.00) cash.
    Said sale or exchange shall be made as of the close of business on August 31st, 1929.

Paragraph 4 is as follows:

4. The Shareholders further agree that they will proceed forthwith to cause a Holding Company to be organized (herein called the "Holding Company"), which Holding Company will have an authorized capital stock of Twenty Thousand (20,000) shares of One Dollar ($1.00) par value and that they will cause such Holding Company to issue one (1) share of its stock to each Shareholder for each share of stock in the New Bank to which such Shareholder would be entitled on consummation of consolidation by virtue of ownership of the stock in one or more of the Consolidating Banks deposited hereunder and the remainder of said Twenty Thousand (20,000) shares of stock shall be issued to such person or corporation as shall be designated by the Shareholders who contribute Additional Stock under subdivision "7" hereof, to be held by such person or corporation for the benefit of such Shareholders. As Additional Stock is released under said Sub-division "7" an equal number of shares of the Holding Company shall likewise be released by the person or corporation holding same.

Paragraph 5 is in part as follows:

5. * * * All assets of the Bank which have been heretofore charged off, or may hereafter be charged off, on or before August 31st, 1929, shall be transferred to and shall become the property of the Holding Company.

If after making the examination herein referred to in Sub-division "6" hereof, the company finds the assets and earnings of the Consolidating Banks in their opinion to be other than as herein stated, the Company's sole remedy herein shall be to rescind this contract, but if upon examination it finds the capital surplus and undivided profits and the earnings of the Company to be satisfactory to it, and the Company consummates the sale or exchange of stock as herein provided for, then the Company shall be deemed to have accepted the stock of the New Bank and the assets and earnings of the Consolidating Banks and shall thereafter have no further claim of any kind against the shareholders, on account of the statements contained in this subdivision "5".

Paragraph 6 is in part as follows:

6. It is further agreed that the Company shall cause examination to be made of assets of the Consolidating Banks and if, in its opinion, the New Bank has in excess of Two Million Dollars ($2,000,000.00) book value of assets which are not proper assets for Banks to own and carry the Company may, at its option, cancel this agreement. If, however, in the opinion of the Company there are not in excess of Two Million Dollars ($2,000,000.00) book value of such assets, the Company shall loan to the Holding Company the amount of the book value of such assets, and the Shareholders agree that they will cause the Holding Company to buy from the New Bank and the New Bank to sell to the Holding Company, such assets at book value up to the face amount of such loan.

Paragraph 7 is as follows:

7. The Company further agrees that it will cause to be issued to the Holding Company one share of stock of the Company for each share of stock of the New Bank which is sold or exchanged under the terms of this agreement by the subscribing Shareholders, provided that, not less than Twenty Thousand (20,000) shares of stock of the Company shall be issued to said Holding Company. In the event that less than all of the stock of the New Bank is sold or exchanged hereunder, as aforesaid, so that less than Twenty Thousand (20,000)

shares of stock of the Company are issued to the Holding Company as aforesaid, then the subscribing Shareholders will assign, transfer and deliver to the Holding Company from the stock of the Company, which they each receive hereunder, such additional number of shares of stock of the Company (herein called "Additional Stock") as is necessary to make up the deficit.

The Holding Company shall agree that it will not sell any of said Twenty Thousand (20,000) shares of stock of the Company without the consent of the Company until the loan, herein referred to, is reduced to One Million Four Hundred Thousand Dollars ($1,400,000.00) or less. When the loan has been reduced to One Million Four Hundred Thousand Dollars ($1,400,000.00) and thereafter as further reductions on the loan are made, then the additional stock deposited with the Holding Company as aforesaid shall be released on this basis, that is to say—one share of such Additional Stock shall be released for each Seventy Dollars ($70.00) reduction of the principal amount of the loan below One Million Four Hundred Thousand Dollars ($1,400,000.00).

When all of the Additional Stock has been released as aforesaid and the loan has been reduced below One Million Four Hundred Thousand Dollars ($1,400,000.00) as aforesaid, the Holding Company may offer to each of its Shareholders the right to purchase one (1) share of Bancorporation stock at Seventy Dollars ($70.00) per share for each share of Holding Company stock owned by such Shareholder and all moneys received from sale of such stock shall be applied in payment of the loan. Any stock of Northwest Bancorporation, which is not acquired by the Shareholders of Holding Company within thirty (30) days after offer is made, shall be sold by the Holding Company at such price or prices as it may determine upon except that none of said stock shall be sold for less than Seventy Dollars ($70.00) per share without the consent of the Company.

If Additional Stock of the Company is transferred to the Holding Company as aforesaid to make up the full Twenty Thousand (20,000) shares of stock, then if the other Shareholders of the New Bank become parties to this agreement and deposit their stock hereunder with the result that an excess of Twenty Thousand (20,000) shares of stock of the Company are issued to the Holding Company, the excess shall be released by the Holding Company out of the Additional Stock deposited hereunder.

As Additional Stock of the Company is released by the Holding Company, it shall be delivered to such person or corporation as the Shareholders who contributed same shall designate to be held by such person or corporation for the benefit of the contributing Shareholders under such terms and conditions as the contributing Shareholders shall agree upon.

In the event that it becomes necessary to sell any of the said Twenty Thousand (20,000) shares of stock of the Company in order to pay the loan of the Company to the Holding Company as aforesaid, then the additional shares of stock shall be sold last.

The agreement provides that the petitioner shall not be bound by the agreement, except at its option, in case "the merger * * * cannot be consummated" because of any ruling of law or ruling of any public official, and the petitioner shall not be bound, except at its option, "until the holders of the shares of stock of the Consolidating Banks as will receive Eighty-five Per Cent (85%) of the stock of the New Bank have executed this agreement and deposited their stock hereunder."

The petitioner found upon examination of the assets of the three banks that $3,250,000 book value of their assets were not proper assets for the bank to own. The examination was completed about September 12, 1929. The petitioner then made an agreement supplemental to the agreement dated August 21, 1929, which supplemental agreement provides in part as follows:

* * * it is agreed between the parties hereto that said assets to the amount of $3,250,000 may be selected by the Company from the assets of said banks and transferred and delivered to the Holding Company as provided in said original contract. That the company shall loan to the Holding Company the $3,250,000 upon the same terms and conditions as provided for in said original contract, in lieu and place of the $2,000,000 designated therein.

This supplemental agreement also provides that the petitioner shall select the assets to be furnished the Iowa-Des Moines National Bank & Trust Co. and all excess assets shall become the property of the Holding Co. It was to become effective " upon the same being signed by the holders of a majority of the stock in said banks and the Company." The petitioner signed it on September 12, 1929.

There is some contradiction in the evidence as to the exact date upon which the petitioner received the stock of the " New Bank " and issued its own stock in exchange. The stipulation states that in accordance with the terms of the contracts all of the stock of the three combining banks was endorsed in blank and delivered to the Iowa National Bank " prior to September 19th, 1929 " and in accordance with the terms of the contracts " and on September 29th, 1929, the stock of the Iowa-Des Moines National Bank & Trust Co. was issued direct to " the petitioner and the petitioner " issued its stock direct to all former stockholders " of the three combining banks " as their interests appeared." The stipulation was made " subject to the right of either party to offer evidence as to facts not inconsistent herewith." Yet the petitioner introduced evidence at the hearing without objection which showed that the petitioner on September 20, 1929, issued its stock to the former stockholders of the three banks in exchange for the stock of the " New Bank." This discrepancy in dates is not important so far as decision of the issues in this case is concerned, but the stipulation must be in error. On September 20, 1929, 85,636 shares of the stock of the petitioner were issued pursuant to the agreements to the former stockholders of the three old banks and 19,039 shares of the stock of the " New Bank " were issued directly to the petitioner on or about that same date.

Arrangements were made to place excess and undesirable assets in the hands of the holding company mentioned in the contracts instead of placing them in trust as provided in the agreement with

the three banks. The Stockholders Investment Co. was organized for that purpose. Its stock was issued to the former stockholders of the three banks. Neither the petitioner nor any of the banks ever owned any of its stock. It borrowed $3,250,000 from the petitioner and $212,168.89 from the "New Bank", with which it purchased from the latter certain assets.

The Des Moines Savings Bank & Trust Co. owned property just prior to the close of business on September 20, 1929, which had cost it $512,788.27. This property was carried on that owner's books at $258,375.79. The Commissioner had allowed it deductions in 1926, 1927, and 1928 totaling $127,349.16 on account of its successive reductions in the book value of this property. The property was transferred to the Iowa-Des Moines National Bank & Trust Co., pursuant to the agreements already referred to, at a value of $258,375.79. It was carried on the books of that bank at that figure after the close of business on September 20, 1929, until October 1, 1929, when it was sold to Stockholders Investment Co. for $258,375.79.

It is thus obvious that the Iowa-Des Moines National Bank & Trust Co. sustained no loss on the sale of this particular property unless it is entitled to use as its basis for loss the same basis which the prior owner, the Des Moines Savings Bank & Trust Co., would have been entitled to use. Furthermore, the latter, having written down the cost on its books and having benefited from loss deductions on account of a part of the amount written off, could not claim as its adjusted basis more than the excess of cost over the total amount allowed as deductions in prior years. There is nothing to suggest that the deductions were not properly claimed and allowed. Even a reorganization does not result in double deductions. The question as to these particular assets is thus narrowed to whether or not the Iowa-Des Moines National Bank & Trust Co. sustained a deductible loss of $127,063.32.

The Des Moines National Bank owned real estate in 1927 which had cost it $881,044.39. It formed in 1927 twelve corporations to hold its real estate. The bank then conveyed the real estate to these corporations at cost. Thereafter the bank held notes of the corporations in the total amount of $881,044.39. These notes were written down to $681,044.39 on September 20, 1929, and were immediately transferred to and placed upon the books of the Iowa-Des Moines National Bank & Trust Co. at $681,044.39. The latter bank sold the notes to the Stockholders Investment Co. for $681,044.39 on October 1, 1929. Here again the Iowa-Des Moines National Bank & Trust Co. would not be entitled to use a basis of $881,044.39 and claim a loss of $200,000 unless it is entitled to use the basis of the transferor and unless that basis is not to be reduced by $200,000.

The statement attached to the notice of deficiency shows among adjustments to income as disclosed by the revenue agent's report:

Unallowable deductions * * *
    (b) Loss on real estate (company #12) _____ $27, 620. 53
    *      *      *      *      *      *      *
Explanation of Items
    *      *      *      *      *      *      *
    (b) Iowa-Des Moines National Bank and Trust Company, (company #12)
        Loss on real estate disallowed _____ $38, 633. 83
        Write down of assets in prior year not considered in
           sale transaction and here allowed _____ 11, 013. 30

        Income increased _____ $27, 620. 53

It is impossible to tell from the record whether this adjustment relates to the items in controversy in issue (1) or, if it does not relate to those items, what action the Commissioner took in regard to those items. At no time has counsel for the Commissioner admitted that the Commissioner disallowed the deduction, or some or any part of the deduction, claimed under issue (1). On the other hand, he has never made any point of the petitioner's failure of proof. The return is in evidence. The revenue agent's report, upon which the computation of the deficiency is based, is not in evidence. The return is a long and complicated one. The Board is unable to determine what action the Commissioner took in regard to the items mentioned as being involved in this issue. Since the petitioner has failed to show what the action of the Commissioner was in regard to these particular items, it is, of course, impossible to say that the Commissioner erred. But aside from this difficulty, for which the petitioner alone is responsible, the petitioner must lose this point.

The combination of the three banks was a reorganization within the meaning of that term as defined in section 112 (i) (1) (A) of the Revenue Act of 1928, since there was either a consolidation or merger of the three banks. But it does not follow as a necessary consequence of a reorganization that the property transferred pursuant to the plan of reorganization takes the same basis for gain or loss in the hands of the transferee that it had in the hands of the transferor. As a general rule the basis for gain or loss is the cost of the property to the owner. Sec. 113 (a). There are certain exceptions to that general rule. The petitioner contends that the exception provided in section 113 (a) (7) applies. The provision is as follows:

SEC. 113. BASIS FOR DETERMINING GAIN OR LOSS.

    (a) *Property acquired after February 28, 1913.*—The basis for determining the gain or loss from the sale or other disposition of property acquired after February 28, 1913, shall be the cost of such property; except that—
    *      *      *      *      *      *      *

(7) TRANSFERS TO CORPORATION WHERE CONTROL OF PROPERTY REMAINS IN SAME PERSONS.—If the property was acquired after December 31, 1917, by a corporation in connection with a reorganization, and immediately after the transfer an interest or control in such property of 80 per centum or more remained in the same persons or any of them, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. * * *

The petitioner's theory is that it owned all of the stock of the three banks immediately prior to the reorganization and it owned all of the stock of the " New Bank " after the reorganization; an interest or control in the property transferred by each combining bank remained in the petitioner; no gain or loss was recognized to any transferor; and therefore the basis of the property to the transferee is the same as it would be in the hands of the transferor. .

However, the facts do not support this argument. The petitioner never contracted to acquire and it never acquired the stock of any one or more of the combining banks prior to the combination. Each contracting shareholder of the combining banks agreed, in view of the contemplated reorganization, to sell or exchange " the shares of stock in the New Bank which he receives." The petitioner did not own any of the stock of the transferor banks and consequently lacked the control to bring into operation the exception provided in section 113 (a) (7). Cf. *Durand-McNeil-Horner Co.*, 30 B. T. A. 769; *American Compress & Warehouse Co.* v. *Bender*, 70 Fed. (2d) 655; certiorari denied, 293 U. S. 607.

The petitioner suggests no other theory on which it would be entitled to use the old bases. The control required in section 113(a) (7) did not remain in the old stockholders of the banks, since they were already under contract to permit the shares in the " New Bank " to be issued directly to the petitioner in order to complete the plan of reorganization. In no real sense were they ever the owners of the new shares. Cf. *Wilbur F. Burns*, 30 B. T. A. 163, 172. According to the plan the petitioner was to become the owner of the shares of the " New Bank " immediately after the transfer and combination became effective. Section 113(a) (6) does not apply because the " New Bank " acquired the property by the issuance of its stock as consideration for the transfer of the property to it. See the last sentence of section 113(a) (6). Nor does section 113(a) (8) apply, since the control mentioned in section 112(b) (5) was lacking. Thus none of the exceptions apply and the " New Bank " does not take the old bases for the properties transferred to it. There is no evidence and no contention that the cost of the properties to the " New Bank " was greater than the amount it realized from the sale. The evidence shows that its cost was the exact equivalent of

the amount realized. Consequently the Iowa-Des Moines National Bank & Trust Co. sustained no deductible loss from the disposition of the assets to Stockholders Investment Co. Other phases of the transaction need not be weighed to see whether or not they meet the requirements of any provision of section 113(a) already considered.

The Iowa-Des Moines National Bank & Trust Co. had taxable net income of $3,855.45 for the period September 21 to September 29, 1929. In determining the deficiency $228,385.73 was included in consolidated net income as income of that bank for the period September 29 to December 31, 1929. The Iowa National Bank had a net loss of $220,501.35 for the period January 1 to September 20, 1929. No part of that net loss has been deducted in computing the deficiency.[1]

The petitioner contends that the Iowa-Des Moines National Bank & Trust Co. and the Iowa National Bank are one and the same corporation and therefore the net loss of the Iowa National Bank for the period January 1, 1929, to the effective date (September 20, 1929) of the combination of the three banks can be used to reduce the income of the Iowa-Des Moines National Bank & Trust Co. for the remaining portion of the year 1929. The benefit of the net loss provision of the statutes has been held to be personal to the taxpayer sustaining the loss, so that a net loss of one taxpayer can not be deducted from later income of any other taxpayer. *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435; *Central National Bank*, 29 B. T. A. 530; *General Finance Co. of Philadelphia*, 32 B. T. A. 949. Thus the first question on this point is whether the Iowa-Des Moines National Bank & Trust Co. was the same taxpayer as the Iowa National Bank within the meaning of section 117(b), or whether there were two separate taxpayers. A true consolidation results in a wholly new corporation, while in the case of a merger there is a continuation of one of the combining corporations. See discussion and authorities cited in *R. D. Musser*, 2 B. T. A. 1031; *A. J. Siegel*, 4 B. T. A. 186; and *Grange National Bank*, 22 B. T. A. 1209. Whether or not there is a new grant of corporate powers by the sovereign and a new corporation created depends primarily upon the statutory authority for the combination effected. *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665, 670. If under that authority there may be either a true consolidation or a true

---

[1] Counsel for the respondent at the request of counsel for the petitioner agreed at the hearing (see Record p. 33) " that the cost of the stock of the Iowa National Bank to the Northwest Bancorporation was in excess of $221,000." The obvious purpose of the request was to meet a certain requirement of Regulations 75, art. 41, par. (c). This stipulation can not be accepted to contradict the clear evidence that the petitioner never bought any Iowa National Bank stock. It must mean that the cost to the petitioner of that portion of the stock of the " New Bank " allotted to the stockholders of the Iowa National Bank was in excess of $221,000.

merger, then the intent of the parties and the terms of their agreement become quite important.

The question of whether the corporate existence of one national bank is continued under the statute in question because the consolidation takes place under the charter of that particular bank has been discussed by the Board and by the courts a number of times. The results reached have not been uniform, but the weight of authority seems to be for the view that the resulting bank is a new corporation, different from each of the consolidating banks. *Bonnet v. First National Bank of Eagle Pass*, 24 Tex. Civ. App. 613; 60 S. W. 325; *Buist's Estate*, 297 Pa. 537; 147 Atl. 606; *First National Bank of Tulsa v. Hoover* (Tex. Civ. App. 1925), 269 S. W. 262; *Unaka & City National Bank v. United States*, 50 Fed. (2d) 1031; certiorari denied, 284 U. S. 645; *Meek v. Stein*, 5 Fed. Supp. 656; *R. D. Musser*, 2 B. T. A. 1031; *Grange National Bank*, 22 B. T. A. 1209; *Manufacturers Trust Co.*, 28 B. T. A. 1260; *National Bank of the Republic of Chicago*, 31 B. T. A. 680. *Contra: A. J. Siegel*, 4 B. T. A. 186; *United States v. Siegel*, 52 Fed. (2d) 63; *Worcester County National Bank*, 263 Mass. 444; 162 N. E. 217. (See also decision of the Supreme Court of the United States in that case *Ex Parte Worcester County National Bank*, 279 U. S. 347.) Cf. *Commonwealth v. First National Bank*, 303 Pa. 241, 154 Atl. 379; *Overbrook National Bank of Philadelphia*, 23 B. T. A. 1390. The Circuit Court of Appeals for the Eighth Circuit said in the *Siegel* case, *supra*, that the resulting corporation was " an essentially different corporation " from the one in which the taxpayer originally held shares, yet it seemed to be of the opinion that the corporate existence of the original bank was continued. A sufficient grant of new corporate powers is contained in the act. Here the parties spoke of the *Iowa-Des Moines National Bank & Trust Co.* as the " New Bank " and it certainly was a very different bank from the Iowa National Bank. It had different capital, assets, stockholders, customers, and management. It made profits during 1929 whereas the Iowa National Bank had been suffering losses. Of course, some of the circumstances mentioned would not be determinative of the question before the Board. Furthermore, the cases cited are not directly in point, yet after a full consideration of all of the facts and circumstances we have come to the conclusion that the petitioner has failed to show that the Iowa-Des Moines National Bank & Trust Co. is entitled to deduct the net loss of the Iowa National Bank. Cf. *Brandon Corporation v. Commissioner*, 71 Fed. (2d) 762.

The petitioner filed a consolidated return for the calendar year 1929 in which it included the income and deductions of the Iowa-Des Moines National Bank & Trust Co. for the period from Sep-

tember 29 to the end of the year. The Commissioner accepted that period as the period of affiliation of those two corporations. Section 141 (a) of the Revenue Act of 1928, provides, " In the case of a corporation which is a member of the affiliated group for a fractional part of the year the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group." The petitioner now contends, under the third issue, that it became the owner of all of the stock of the three original banks not later than September 18, 1929, and therefore their income and deductions for September 18, 19, and 20 should be included in the consolidated return.[2] It originally contended that affiliation began on September 13, 1929, but conceded later that the evidence does not support that contention. It adopts the 18th day of September because of the stipulation that prior to the 19th all of the stock of the three banks had been endorsed in blank and deposited in escrow pursuant to the agreements of the petitioner with the stockholders of the three banks. However, the parties to those agreements never intended that the petitioner should become the owner of the stock of the three banks. The petitioner was to exchange its stock or pay cash, not for the stock of the three banks, but for the new stock of the Iowa-Des Moines National Bank & Trust Co. after the combination and transfer of assets had been carried out. The petitioner never owned any of the stock of the three combining banks and those three banks were not members of an affiliated group of which the petitioner was parent. Therefore their income and deductions for the 18th, 19th, and 20th of September may not be included in the petitioner's consolidated return for 1929 under the statute. That is the extent of the petitioner's contention in regard to affiliation and no more need be decided, since neither party asks, as an alternative, to have the income of the Iowa-Des Moines National Bank & Trust Co. for the period September 20 to 28, inclusive, included in the consolidated return.

Reviewed by the Board.

*Decision will be entered for the respondent.*

---

[2] The Des Moines Savings Bank & Trust Co. in another proceeding claims it was an independent bank until September 20, 1929.