NATIONAL BANK OF COMMERCE, SUCCEEDED BY CITY NATIONAL BANK OF COMMERCE, SUCCEEDED BY CITY NATIONAL BANK, WICHITA FALLS, TEX., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

CITY NATIONAL BANK, WICHITA FALLS, TEX., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 19641, 22615. Promulgated May 23, 1930.

*Don T. Haynes, Esq.,* and *John B. King, Esq.,* for the petitioners.
*T. M. Mather, Esq.,* and *Bruce A. Low, Esq.,* for the respondent.

1082

OPINION.

ARUNDELL: The first error assigned is that the assessment of the deficiency in question is barred by the statute of limitations for the reason that the consents executed in 1926 are invalid in that C. E. Basham was without authority to sign these instruments. On April 30, 1920, the National Bank of Commerce was merged with the City National Bank, the merged institution becoming the City National Bank of Commerce under the charter of the City National Bank. Later the name of the merged bank was changed to the City National Bank. On May 23, 1921, a return was filed in the name of the National Bank of Commerce for the four-month period January 1 to April 30, 1920. Within the five-year statutory period applicable to that return, namely, on January 16, 1926, and February 12, 1926, waivers or consents were filed purporting to extend the time for assessment for one year, and these instruments were signed by C. E. Basham as vice president of the National Bank of Commerce.

In order to pass on the question of the validity of the waivers, it is first necessary to determine the effect of the merger on the corporate existence of the two banks. At the time the merger took place the provisions of the National Banking Act relating thereto were sections 1 and 2, chapter 209 (40 Stat. 1043 and 1044), of an act passed November 7, 1918, and entitled "An Act to Provide for the Consolidation of National Banking Associations," which read as follows:

*Consolidation of banks; capital stock; dissenting shareholders.* Any two or more national banking associations located within the same county, city, town, or village may, with the approval of the Comptroller of the Currency, consolidate into one association under the charter of either existing banks, on such terms and conditions as may be lawfully agreed upon by a majority of the board of directors of each association proposing to consolidate, and be ratified and confirmed by the affirmative vote of the shareholders of each such association owning at least two-thirds of its capital stock outstanding, at a meeting to be held on the call of the directors after publishing notice of the time, place, and object of the meeting for four consecutive weeks in some newspaper published in the place where the said association is located, and if no newspapr is published in the place, then in a paper published nearest thereto, and after sending such notice to each shareholder of record by registered mail at least ten days prior to said meeting: *Provided,* That the capital stock of such consolidated association shall not be less than that required under existing law for the organization of a national bank in the place in which it is located: *And provided further,* That when such consolidation shall have been effected and approved by the comptroller any shareholder of either the associations so consolidated who has not voted for such consolidation may give notice to the directors of the association in which he is interested within twenty days from the date of the certificate of approval of the comptroller that he dissents from

the plan of consolidation as adopted and approved, whereupon he shall be entitled to receive the value of the shares so held by him, to be ascertained by an appraisal made by a committee of three persons, one to be selected by the shareholders, one by the directors, and the third by the two so chosen; and in case the value so fixed shall not be satisfactory to the shareholder he may within five days after being notified of the appraisal appeal to the Comptroller of the Currency, who shall cause a reappraisal to be made, which shall be final and binding; and if said reappraisal shall exceed the value fixed by said committee, the bank shall pay the expenses of the reappraisal; otherwise the appellant shall pay said expenses, and the value so ascertained and determined shall be deemed to be a debt due and be forthwith paid to said shareholder from said bank, and the share so paid shall be surrendered and after due notice sold at public auction within thirty days after the final appraisement provided for in this section.

*Effect of consolidation on rights and liabilities.* Associations consolidating with another association under the provisions of the preceding section shall not be required to deposit lawful money for their outstanding circulation, but their assets and liabilities shall be reported by the association with which they have consolidated. And all the rights, franchises, and interests of the said national bank so consolidated in and to every species of property, personal and mixed, and choses in action thereto belonging, shall be deemed to be transferred to and vested in such national bank into which it is consolidated without any deed or other transfer, and the said consolidated national bank shall hold and enjoy the same and all rights of property, franchises, and interests in the same manner and to the same extent as was held and enjoyed by the national bank so consolidated therewith.

A merger under the foregoing provisions was before the Board in *A. J. Siegel et al.*, 4 B. T. A. 186, wherein it was held that, in so far as the bank was concerned under whose charter the three banks there involved were merged, its corporate existence continued, the effect being to merge the identity of the other two banks therein without the creation of a new corporate entity. The case further pointed out the technical distinction between a consolidation and merger and showed that, while the statute quoted above uses the word "consolidate" and not "merge," what is in reality accomplished in a coming together of national banks under these provisions is a " merger " and not a " consolidation." See also *Estate of William L. Curry*, 17 B. T. A. 282, though the situation there was somewhat different from the *Siegel* case and the case at bar in that the merger in that instance took place prior to the enactment of the statutory provisions with which we are here concerned and was accomplished through a purchase and sale of assets and the voluntary liquidation of the absorbed bank. Accordingly, the effect of the merger in the case now before us was to continue the City National Bank in existence without any break in its corporate existence.

This brings us to the second question, namely, what is the status of the absorbed bank, in this instance the National Bank of Commerce, after the merger? It will be noted that no specific provision

is made for an ending of the corporate life of the bank or banks whose charters are not availed of by the merged institution, though all rights of property, franchises and interests are to pass from them and become vested in the merged bank without any deed or other transfer. And the merged bank becomes answerable for the debts, obligations and liabilities of the absorbed bank, whether arising *ex contractu* or *ex delicto*. *First National Bank of Tulsa* v. *Hoover*, 269 S. W. 262.

But this does not necessarily fix the status of the absorbed bank, in this instance the National Bank of Commerce. Whether or not the constituent corporations involved in a given merger continue to exist must be determined on the basis of the statute under which the consolidation or merger took place and the intentions therein expressed. *Central Railroad & Banking Co.* v. *Georgia*, 92 U. S. 665; *Keokuk & Western R. R. Co.* v. *Missouri*, 152 U. S. 301; and *Chicago Title & Trust Co.* v. *Doyle*, 259 Ill. 489; 102 N. E. 790. In *Central Railroad & Banking Co.* v. *Georgia*, *supra*, the court said:

Hence, it is of vital importance to this case to examine the effect of the union of the two companies, under what is called "the consolidation act of the legislature," of August 24, 1872. Did the act contemplate a surrender of its charter by the Central Railroad and Banking Company, and the grant to it of a new charter, or a re-grant of the old? It may be that the consolidation of two corporations, or amalgamation, as it is called in England, if full and complete, may work a dissolution of them both, and its effect may be the creation of a new corporation. Whether such be the effect or not must depend upon the statute under which the consolidation takes place, and of the intention therein manifested.

The foregoing case involved the merger of two corporations under an act of the Georgia Legislature and is a leading case on the subject of the effect of a merger on the continued existence of the corporations which were parties to the merger.

The statute with which we are concerned is silent as to the future existence or nonexistence of the absorbed institution, provision being made for a consolidation (heretofore shown to connote a merger) under the charter of either existing bank on such terms and conditions as may be lawfully agreed upon in a certain prescribed manner and that the consolidation shall be with the approval of the Comptroller of the Currency. The contract or agreement under which the merger took place was not submitted in evidence and therefore we do not know its terms and conditions. The statute, however, provides for a completeness of transfer of assets, liabilities, rights, franchises, etc., from the absorbed bank to the merged institution which evidences an intent that the former is to be ultimately dissolved and its function performed by the latter (cf. *Grand Rapids National Bank*, 9 B. T. A. 1119), but we are unable to say from the statute

itself and the evidence before us that a dissolution necessarily took place immediately upon the consummation of the merger, and that thereafter no one other than the merged institution was capable of acting for the absorbed bank in the final settlement of affairs pertaining thereto. Certainly some doubt is cast upon the nonexistence of representatives of the absorbed bank outside of the merged bank by the provision that after the merger has become effective any stockholder who dissents from the merger may, within twenty days from its effective date, give notice to the directors of the bank in which he is interested and cause an appraisal of, and settlement for, his stock to be made. As the Comptroller of the Currency states in his regulations governing mergers under the act in question, while the notice, in the case of a stockholder of the absorbed bank, must be given to the board of directors of that bank, settlement for the stock must be effected by the merged bank, since it alone has assets for that purpose. This, however, is sufficient to raise the inference of the existence of some machinery or agency outside of the merger which would act for the absorbed bank in the settlement of certain affairs pertaining thereto, but on the record before us we are unable to say what this may be or how it may function. Cases of this character are of course to be distinguished from those where voluntary dissolution takes place as an incident to a consolidation or union of two banks. Voluntary dissolution is provided for under an entirely different section of the statute (section 5220, Revised Statutes) and it is well established that in the case of a voluntary dissolution the corporate existence of the bank is preserved for the purpose of liquidating its affairs. *Nebraska National Bank* v. *Union Stockyards National Bank*, 187 N. W. 883; 108 Nebr. 417; *Brown* v. *Deposit National Bank*, 125 Misc. Rep. 247; 211 N. Y. S. 366; and *Fagan* v. *Texas Co.* (Texas Civ. App., 1920), 220 S. W. 346.

In this situation, we are unwilling to say that it has been affirmatively established by the Commissioner, upon whom such burden rests, that the waivers in question are valid and effective to extend the statute of limitations. What we have are waivers in the name of the National Bank of Commerce and signed by an individual who was an officer of such bank prior to the merger. He testified that no authorization was given him to sign such waivers and that so far as he knew he had no connection with the National Bank of Commerce when the waivers were executed by him. Certainly, from the statute itself we find nothing from which we might conclude that by operation of law the old officers continued in their official positions, clothed with authority to perform the act here in question. And if such authorization arose by contract we are met with the difficulty that the agreement under which the merger took

place was not submitted in evidence and therefore we are unable to say what obligations or authority arose therefrom. When dealing with waivers under somewhat similar conditions in *Jonathan Godfrey et al.*, 18 B. T. A. 775, the Board said that, "In these circumstances the respondent must prove that the agreements which he pleads and upon which he relies were actually entered into by the parties and that such agreements are valid and effect an extension of the statutory period within which he has authority to assess." Since the return in this instance was filed more than five years prior to the date of the deficiency notice and since the validity of the waivers has not been established, the assessment of the deficiency against the National Bank of Commerce must be considered as barred.

Regardless, however, of what may have been the status of the National Bank of Commerce after the merger, we think it is clear that, under the statute under which the merger took place and heretofore quoted in full (chapter 209, sections 1 and 2, of an Act of Congress passed November 7, 1918, and entitled "An Act to Provide for the Consolidation of National Banking Associations"), the City National Bank became the transferee of the assets of the National Bank of Commerce within the meaning of section 280, Revenue Act of 1926. The completeness of transfer of assets to, and assumption of liabilities by, the merged institution contemplated by the statute can leave no doubt that it is intended that a liability of the character here in controversy is to be satisfied by the merged institution. *First National Bank* v. *Hoover, supra.* And whatever may have been the function performed, if any, by any agency existing outside of the City National Bank with respect to the National Bank of Commerce after the merger, these functions would have been performed, in so far as the tax liability is concerned, merely as an incident to the determination of a liability which must be satisfied by the City National Bank. The affirmative allegation of the Commissioner to the effect that net assets in excess of the tax liability now sought to be asserted were transferred to the City National Bank is fully supported by a stipulation of the parties to these proceedings.

Since the City National Bank is a transferee, does the statute of limitations bar the assessment and collection therefrom of the deficiency here in question? We think not. The return for the National Bank of Commerce was filed on May 23, 1921, and giving to it the most favorable interpretation for the petitioners, namely, that it was a valid return which would start the running of the statute, the original statutory period with respect thereto would have expired on May 23, 1926, or after the passage of the Revenue Act of 1926. While the notice to the National Bank of Commerce, on account of the deficiency determined for the period January

1, 1920, to April 30, 1920, with respect thereto, was not mailed until after May 23, 1926, namely, on July 2, 1926, a notice was mailed to the City National Bank as transferee on November 17, 1926, and a petition was duly filed on January 15, 1927, or within one year after the expiration of the statutory period with respect to the National Bank of Commerce. Section 280(b), Revenue Act of 1926, provides that:

(b) The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

(1) Within one year after the expiration of the period of limitation for assessment against the taxpayer; * * *

The fact that assessment had not been made against the National Bank of Commerce before the proceeding was had against the City National Bank is not material. *Woodley Petroleum Co. et al.*, 16 B. T. A. 253. Nor, since the proceeding against the City National Bank was begun within one year after the expiration of the statutory period applicable to the National Bank of Commerce, would the fact that it has not been shown that assessment could be made against the National Bank of Commerce be a bar to the assessment against the City National Bank. *Angier Corporation*, 17 B. T. A. 1376. In the foregoing case, the Board, in disposing of a contention somewhat similar to the issue here presented, said:

We are of opinion that the first contention is without merit. It is not necessary that the respondent assess the tax against the transferor before proceeding against the transferee. *Woodley Petroleum Co. et al.*, 16 B. T. A. 253. It is sufficient if he proceeds against the transferee within the period provided by the statute therefor. Assuming that the assessment is invalid as the petitioner urges it is, it does not follow that the respondent is precluded from asserting the liability of the taxpayer against the petitioner. The taxpayer's return for 1920 was filed on March 15, 1921, and the five-year period for assessment of the tax allowed by the Revenue Act of 1918 and subsequent Revenue Acts expired on March 15, 1926, which was after the effective date of the Revenue Act of 1926, and the deficiency notice was mailed to the petitioner within one year from the expiration of the five-year period. Section 280(b) of the Revenue Act of 1926 provides as above set forth that:

The period of limitation for assessment of any such liability of a transferee or fiduciary shall be as follows:

(1) Within one year after the expiration of the period of limitation for assessment against the taxpayer; * * *

We are of opinion that the proceeding against the petitioner is timely and that the assessment of the tax is not barred.

We are accordingly of the opinion that the assessment of the tax in question is not barred as against the City National Bank, transferee in these proceedings.

Since the tax in question is held not to be barred in so far as the transferee is concerned, it becomes necessary to consider the merits of the contention advanced that there existed abnormalities in income

for the period January 1, 1920, to April 30, 1920, which would bring the case within the provisions of section 327 of the Revenue Act of 1918, and thus permit the tax to be computed in the manner provided in section 328 of the same act.

The first contention advanced in support of the existence of such an abnormality is that the income is high because a period of four months is being used instead of a full year of twelve months and that if a full year had been used, the income would have been proportionately much less. This contention, however, overlooks the fact that while income for only four months was included in the return, the return as filed is to be considered a return for a full year regardless of whether the National Bank of Commerce was dissolved on April 30, 1920, or continued to exist throughout the remainder of the year. *Louis Hymel Planting & Manufacturing Co.*, 5 B. T. A. 910. The same tests as to the existence of an abnormality would have to be satisfied with respect to such a return as in the case where the corporation has a full year's operations included in the return as filed, and without unusual circumstances shown no abnormalities can be said to exist which would permit of an application of the special assessment provisions. (Cf. *Falcon Steel Co.*, 15 B. T. A. 1133.)

And when we come to examine the unusual circumstances urged upon us by the petitioners, we are not satisfied that they establish the existence of an abnormal condition as contemplated by the statute. It is true that income is high for this period as compared with the previous earning history of the National Bank of Commerce, but we do not understand that a large income of itself is ground for special assessment. Nor do we think that the circumstances, as affecting income, upon which the petitioners rely, establish that an abnormal condition existed. Much reliance is placed upon the fact that income was proportionately greater during the first months of the year than during the remainder of the year, due to the fact that this bank catered to farm loans which were made largely in January, February, and March, but we were furnished no information as to the extent of these loans, the relation which they bore to the total business done, or even an approximation as to how much income was affected or alleged to be distorted thereby. Certainly, the making of farm loans was by no means the only source of the bank's income. In fact, one of the major reasons assigned for the high income was the oil boom, which was at its height in Wichita Falls during the period in question, and a reasonable conclusion which we think may be drawn from the evidence before us is that the large income is attributable more to that fact than to the fact that only the more profitable part of a seasonal business is being included in the period before us. The statute

specifically prohibits the application of the special assessment provisions to a case where a high rate of profit is earned upon a normal invested capital, and we have nothing before us to indicate that the invested capital was other than normal for the earning of the high profits under the advantageous circumstances then prevailing.

Another contention advanced as showing an abnormality in income is the failure of the National Bank of Commerce to receive the benefit of a deduction on account of the worthlessness of certain debts which were on its books during the period before us and which passed to the merged corporation upon the consummation of the merger. Not only were these debts not written off as required by statute in order to be deductible, but also there is no evidence before us from which we can say that they were ascertained to be worthless prior to April 30, 1920. While neither of the banks which were parties to the merger made any attempt to reduce the paper held by them on account of deficiencies in value then existing, the fact that they did not do this, and later some of them were ascertained to be worthless, does not necessarily mean that the debts with which we are concerned were considered worthless at that time. The oil boom was at its height and well may it have been that all parties had well-founded hopes for the recovery on these assets. In any event, we fail to see any basis for considering that an abnormality exists because of the disallowance of a deduction so clearly prohibited by statute. To grant special assessment under such circumstances would be doing indirectly that which can not be done directly. With respect to the income items of $15,195.40 and $7,500, which the petitioners urge upon us as ground for special assessment, we fail to see anything therein so abnormal as to constitute grounds for the application of the relief provisions. Further, some point is made of the fact that, due to the manner in which the National Bank of Commerce kept its books, income was reported before it was in fact earned, but this evidence is so general that we are unable to tell what effect, if any, this had upon the total income reported for the four-month period.

In view of the foregoing and upon the basis of the entire record as presented to us, we are of the opinion that abnormalities as contemplated by the statute which would entitle the petitioners to the benefit of the special assessment provisions have not been shown to exist.

Reviewed by the Board.

*Judgment will be entered for the petitioner in Docket No. 19641, and for the respondent in Docket No. 22615.*

SMITH, dissenting: The majority of the Board has held that the National Bank of Commerce is not entitled to have its tax liability for the four-month period ended April 30, 1920, computed under the provisions of section 328 of the Revenue Act of 1918. To that I can not agree.

The vice president of the National Bank of Commerce testified that it was primarily a farm bank; that it specialized in farm loans; that the great majority of such loans either were made or renewed during the first three months of the year, and that the placing of the income of the bank during such period on an annual basis would result in the reflection of an abnormal profit. At the taking of testimony in these proceedings the respondent was represented by able counsel. However, the testimony of the vice president was not broken down by cross-examination nor has it been discounted otherwise. The respondent has computed tax liability arising from the earnings over the four-month period by placing the petitioners on an annual basis. On the basis used by the respondent, the percentage of taxable net income to invested capital was 54.54 per cent, whereas the average percentage of taxable net income to invested capital for the preceding three years, based on a full year's operation for each year, was 26.49 per cent.

In view of the foregoing I am convinced that the testimony of the vice president to the effect that the bank enjoyed a seasonal business and that the placing of its earnings for the four-month period on an annual basis would show an abnormal profit has been fully corroborated, and that a computation of petitioners' tax liability for the period under review on an annual basis results in an abnormal distortion of the relationship between taxable net income and invested capital. Consequently, it appears to me that on this point the majority opinion, where it states—

* * * Much reliance is placed upon the fact that income was proportionately greater during the first months of the year than during the remainder of the year, due to the fact that this bank catered to farm loans which were made largely in January, February, and March, but we were furnished no information as to the extent of these loans, the relation which they bore to the total business done, or even an approximation as to how much income was affected or alleged to be distorted thereby. Certainly, the making of farm loans was by no means the only source of the bank's income. In fact, one of the major reasons assigned for the high income was the oil boom, which was at its height in Wichita Falls during the period in question, and a reasonable conclusion which we think may be drawn from the evidence before us is that the large income is attributable more to that fact than to the fact that only the more profitable part of a seasonal business is being included in the period before us. * * *

deals in idle speculation as to what might have been the result had other or different testimony been offered. Such language does not

impress me as resolving doubts in favor of the petitioners, which it is clear must be done. *Gould* v. *Gould*, 245 U. S. 151; *United States* v. *Merriam*, 263 U. S. 179. More especially is this true, perhaps, in cases involving special assessment, since in such cases the proceedings before this Board are, for practical purposes, final. Cf. *Blair* v. *Oesterlein Machine Co.*, 275 U. S. 220; *Williamsport Wire Rope Co.* v. *United States*, 277 U. S. 551; *Clinton Corn Syrup Refining Co.* v. *United States*, 280 U. S. 581; *Live Stock National Bank* v. *United States*, 36 Fed. (2d) 334.

At the time the merger took place there were set up on the books of the bank certain obligations which are referred to in the majority opinion as follows:

\* \* \* Not only were these debts not written off as required by statute in order to be deductible, but also there is no evidence before us from which we can say that they were determined to be worthless prior to April 30, 1920. \* \* \*

While it may be true that the evidence does not show that the debts *were ascertained* to be worthless and while the evidence does show that they were not written off the books, it is a fact, abundantly supported by the testimony taken in these proceedings, that the officials of the bank at or prior to the time of the merger knew that such debts were worthless, but, nevertheless, carried them on their books as good accounts solely due to the fact that it was desired to make as good a showing as possible with respect to the assets to be carried into the merger. Having in mind the action of the respondent in computing tax liability on an annual basis, such facts impress me as revealing an abnormal condition which arose simply because the bank failed to take off-setting deductions.

I am content with the majority opinion respecting the item of $7,500 profit derived from the sale of a lease on the premises on which the bank conducted its banking business, although the effect of the respondent's action in computing tax liability on an annual basis is to magnify such income. However, it is fallacious to say that there is nothing abnormal in a situation where a bank seizes assets on deposit with it, sells them for the purpose of recouping a loss occasioned through cashing a bad check by the owner of the assets. derives from the sale of the assets $15,195.40 more than the amount of the bad check and includes such excess receipts in net income. Aside from the question as to whether the $15,195.40 should have been included in net income at all, it is inconceivable that such action represented a normal business transaction or that the amount of $15,195.40 constituted normal income. Especially is this true where the period during which this whole transaction occurred is placed upon a yearly basis for the purpose of computing income-tax liability.

In view of all the evidence before us I am convinced that the many peculiarities attendant upon the bank's conduct of its business during the four-month period ended April 30, 1920, indicate abnormalities in income, the effect of which are greatly magnified by the computation of tax liability on an annual basis. For these reasons I am convinced that the National Bank of Commerce is entitled to the relief granted by section 328 of the Revenue Act of 1918.