T.C. Memo. 1997-117


UNITED STATES TAX COURT


JEFF A. WILTZIUS, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


WILLIAM ROBERT WALDORF, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 19235-93, 19344-93.          Filed March 6, 1997.


Jeff A. Wiltzius, pro se.

William Robert Waldorf, pro se.

<u>Joanne B. Minsky</u> and <u>Stephen Takeuchi</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that petitioner Jeff
A. Wiltzius is liable as a transferee for the unpaid income tax

and additions to tax of House of Babes of Fern Park, Inc. (House of Babes), for 1984 and 1985 in the amount of $155,990, and that petitioner William R. Waldorf is liable as a transferee in the amount of $225,319.

We must decide the following issues:

1. Whether petitioners are liable as transferees for the 1984 and 1985 income tax and additions to tax of House of Babes. We hold they are;

2. whether Wiltzius' and Waldorf's interests in a note from the buyer of House of Babes are worth $23,376.15 and $34,783, as petitioners contend; $118,125 and $170,625, as respondent contends; or some other amount. We hold that their interests in the note are worth $88,593.75 and $127,968.75, respectively;

3. whether Wiltzius' plea agreement (in which he pled guilty to filing false income tax returns for 1984 and 1985 and agreed to pay $11,329.94 in restitution) limits his liability as a transferee for House of Babes' income taxes for 1984 and 1985. We hold that it does not;

4. whether the doctrines of res judicata, collateral estoppel, and equitable estoppel bar respondent from assessing tax against petitioners as transferees of House of Babes for 1984 and 1985. We hold that they do not;

5. whether the statututory period of limitations bars respondent from assessing transferee tax liability against petitioners for 1984 and 1985. We hold that it does not.

Unless stated otherwise, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioners

Jeff A. Wiltzius (Wiltzius) lived in Casselberry, Florida, and William R. Waldorf (Waldorf) lived in Maitland, Florida, when they filed their petitions in these cases.

B. House of Babes of Fern Park, Inc.

1. Formation and Operation

Waldorf incorporated House of Babes in Florida on May 1, 1983. House of Babes is a topless bar. Initially, Waldorf was the sole shareholder of House of Babes. He was president of House of Babes from 1984 to 1986.

Seminole County zoning ordinances, regulations, and rules generally did not permit topless bars. However, House of Babes was permitted to operate because it opened before Seminole County prohibited topless bars (i.e., it was grandfathered). Under the terms of the grandfathering, if it were closed as a sanction for violating any county rule or regulation, it could not reopen.

House of Babes received revenue from cover charges, the sale of nonalcoholic beverages, vending machines, video games, and a juke box. Most customers paid in cash, but some used credit cards.

### 2. Shareholders

Tom Godby (Godby) bought a 50-percent interest in House of Babes from Waldorf. Nelson Arencibia (Arencibia) bought a 10-percent interest from Waldorf and a 10-percent interest from Godby. Waldorf, Godby, and Arencibia owned House of Babes from January to September 1984. Arencibia owned a 22.5-percent interest in House of Babes in September 1984.

Wiltzius bought Arencibia's 22.5-percent interest on October 1, 1984, for $25,000. Arencibia was making about $1,500 per week from House of Babes when he sold his interest. Wiltzius owned 22.5 percent and Waldorf owned 32.5 percent of the shares of House of Babes from October 1984 to August 1986.

### 3. Skimmed Income

Around May 1984, Waldorf, Godby, and Arencibia agreed to keep two sets of records for House of Babes. Waldorf kept the second set of books to pay less taxes.

Waldorf wrote a memo at a time not stated in the record to the other shareholders explaining how they would skim gross receipts. The memo said that each shareholder's share of the profits would be paid in cash from 50 percent of the gross

receipts on the day the receipts were earned; the rest would be paid by check from the accountant after any expenses for that day had been paid. Waldorf asked the other shareholders to destroy the memo after reading it.

House of Babes paid its shareholders their share of the profits in cash before April 1985. Around April 1985, House of Babes began to pay its shareholders half in cash and half by check.

Waldorf, Godby, and Wiltzius agreed to skim receipts of House of Babes and to divert funds for their personal use. They skimmed 50 percent of the gross receipts earned from Monday to Friday.

House of Babes' officers gave the accountant incomplete information to prepare House of Babes' tax returns. The accountant used the false records to prepare the 1984 and 1985 corporate income tax returns for House of Babes. Waldorf, as president, signed House of Babes' corporate income tax returns for 1984 and 1985, knowing that they were materially false because the shareholders diverted about 50 percent of the corporation's weekday gross receipts to their personal use. House of Babes did not report to the IRS income of $153,755.50 for 1984 and $200,620.50 for 1985.

Wiltzius was not involved in the operation of House of Babes. He did not establish House of Babes' accounting system or

handle cash received by House of Babes. However, he knew about the system House of Babes used to pay shareholders and to keep records. He was not directly responsible for House of Babes' income tax filings and did not give false and incomplete records to House of Babes' accountant, but he knew that Waldorf and Godby were doing so.

### 4. Criminal Investigation of House of Babes

Special Agent Brister (Brister) investigated House of Babes and petitioners for tax crimes. Brister investigated the income tax liabilities of House of Babes from skimmed receipts and the income tax liabilities of House of Babes' shareholders from constructive dividends for 1984 and 1985. He interviewed Waldorf on July 24, 1986.

## C. Sale of the Assets of House of Babes

### 1. Terms of the Sale

On August 14, 1986, the shareholders sold the assets of House of Babes, i.e., the building, land, fixtures, and equipment, to 6400 HWY. 17-92, Inc. (the buyer), for $999,103. Norman Kagen (Kagen) was a shareholder of the buyer and was its accountant. The buyer assumed a $305,814 mortgage, paid $179,387 in cash, and gave a $525,000 promissory note bearing 10 percent interest per year (the note).[1] The buyer agreed to pay $100,000

---

[1]These amounts total $1,010,201, although the parties stipulated that the sale was for $999,103. This inconsistency

(continued...)

of the amount due on the note, with interest of $10,000, 12 months after the closing date of the agreement.  The balance was to be amortized over 10 years and payable in equal monthly installments of $6,598.85.  The monthly payments were due on the first of each month.  The buyer would be in default if it did not make the monthly payment by the 25th day of the month.  If the buyer defaulted, the seller could repossess the property subject to a lien favoring the holder of the mortgage.  The buyer was to maintain hazard and liability insurance of $800,000 and name the sellers as additional insureds on the policy.

The contract of sale was signed by Waldorf as president, Godby as vice president, and Wiltzius as secretary.

As part of the contract, the buyer agreed to comply with all Federal, State, and county laws, ordinances, codes, regulations, and rules, including zoning and easement requirements and building, fire, safety, and health codes.  The buyer and seller understood that it was important for the buyer to maintain House of Babes' grandfathered status by continuously complying with Seminole County rules and regulations.

Waldorf knew that the IRS was investigating House of Babes, and he knew that House of Babes had corporate tax liability for

---

[1](...continued)
does not affect our decision.  There is testimony that the buyer paid $250,000 in cash, which we disregard because the parties stipulated that the buyer paid $179,387 in cash.

skimmed gross receipts when he sold its assets on August 14, 1986.

Waldorf's share of the monthly payment on the note was $2,144. The buyer initially made the monthly payment to Waldorf, who paid each shareholder. The buyer later paid each shareholder directly.

House of Babes and the two other adult entertainment businesses that were operating in Seminole County in 1985 were still operating at the time of trial.

2. Prospects for Payment of the Note

The buyer's shareholders believed that they could repay the note if they made $13,000 per week. Waldorf or Godby told the buyer that House of Babes had been making about $13,000 per week before the sale. House of Babes reported gross receipts in the following amounts on its tax returns:

|  | Gross Receipts | |
| Year | Total | Approximate Weekly Average |
| 1984 | $236,668 | $4,500 |
| 1985 | 310,105 | 6,000 |
| 1986 | 336,830 | 10,200 |

The year after the assets of House of Babes were sold, the buyer reported weekly gross receipts of more than $20,000 per week.

D.    Liquidation and Dissolution of House of Babes

House of Babes was liquidated in August 1986.  House of Babes reported on its 1986 corporate income tax return that it was undergoing a complete liquidation under section 337 and that all of its assets were to be distributed to its shareholders within 12 months.  The liquidating distribution from House of Babes to its shareholders occurred on August 14, 1986.  The State of Florida dissolved House of Babes on August 20, 1987.

The buyer made the $100,000 payment in August 1987 and fully paid the note ahead of schedule.

E.    Waldorf's Sale of His Interest in the Note

Waldorf offered to sell his $170,625 ($525,000 x 32.5 percent) interest in the note to the buyer's shareholders for $50,000.  They did not buy it.  Waldorf also asked five or six friends if they wanted to buy his interest in the note.  They did not.

On February 3, 1988 (about 16 months after the liquidation of House of Babes), Waldorf assigned 47.69 percent of his interest in the note (i.e., $81,371) to Wiltzius' wife, Darlene Wiltzius, in exchange for a limousine.  Waldorf sold the limousine for $22,500 at a time not specified in the record.  On March 9, 1988, Waldorf assigned 52.31 percent of his interest in

the note (i.e., $89,254) to Darlene Wiltzius for $9,000 plus $1,000 that Waldorf owed to her.  Thus, Waldorf, in effect, received $32,500 for his $170,625 interest in the note.

Waldorf sold his interest in the note because he was late in paying some bills, he had no other source of income, and he was in danger of having the mortgage on his house foreclosed. Waldorf knew about the IRS investigation and believed that the IRS was going to take all of the monthly payments that the buyer was making on the note.

Wiltzius signed a document on February 3, 1988, for House of Babes as secretary.

F.   Petitioners' Criminal Convictions and Plea Agreements

1.   Wiltzius' Conviction and Plea Agreement

On November 10, 1991, Wiltzius pled guilty to violating section 7206(1) (filing a false return) for 1984 and 1985 because he skimmed income from House of Babes which he did not report on his personal income tax returns.  Wiltzius' plea agreement provided that the U.S. District Court could order him to make restitution up to $11,329.94 to the IRS.  Paragraph 1(c) of Wiltzius' plea agreement states:  "Defendant agrees to make restitution to the Internal Revenue Service in an amount of

$11,329.94 or any lesser amount as determined and ordered by the Court."

On February 20, 1992, Waldorf pled guilty to violations of section 7201 and 18 U.S.C. section 371 with respect to his personal income tax returns.

Bruce Hinshelwood (Hinshelwood), an assistant U.S. attorney, represented the United States, Marc L. Lubet (Lubet) represented Wiltzius, and Mark H. Randall represented Waldorf in their criminal cases. Lubet and Hinshelwood negotiated the amount of restitution that Wiltzius was to pay the IRS. Lubet believed the agreement covered the total amount of Wiltzius' Federal individual tax liability for 1984 and 1985; i.e., the liability on his personal Form 1040, including fraud and interest. There was no discussion about transferee liability for the taxes of House of Babes.

Wiltzius paid the $11,329.94 restitution shortly after he was sentenced.

2.  Waldorf's and Wiltzius' Plea Agreements

Waldorf's and Godby's plea agreements stated that they aided House of Babes in filing false returns and that they filed false individual returns. Wiltzius' plea agreement does not state that

he aided House of Babes in filing false tax returns.  Godby

agreed to pay restitution.  Waldorf did not.

Waldorf's plea agreement states at paragraph 1(d):

> If the Court accepts the plea agreement, the
> government agrees not to charge defendant with
> committing any other federal criminal offenses
> known to the government at the time of the
> execution of this agreement, arising out of his
> association with House of Babes of Fern Park, Inc.

Wiltzius' plea agreement states at paragraph 1(f):

> If the Court accepts the plea agreement, the
> government agrees not to charge defendant
> with committing any other federal criminal
> offenses known to the government at the time
> of the execution of this agreement, arising
> out of his association with William R.
> Waldorf, William T. Godby, and House of Babes
> of Fern Park, Inc., during 1980 through 1990.

Paragraph 16 of Wiltzius' plea agreement and paragraph 15 of

Waldorf's plea agreement state:

> It is further understood that this agreement
> is limited to the Office of the United States
> Attorney for the Middle District of Florida
> and cannot bind other federal, state or local
> prosecuting authorities.

G.   House of Babes' Income Tax Returns and Respondent's
     Determinations and Notices of Transferee Liability

House of Babes filed its 1985 corporate income tax return on

March 20, 1986.

Respondent determined that House of Babes was liable for (1)

deficiencies in income tax of $50,662 for 1984 and $81,388 for

- 13 -

1985; and (2) additions to tax for (a) fraud of $25,331 for 1984 and $40,694 for 1985 and 50 percent of the interest due on the deficiencies for 1984 and 1985, and (b) substantial understatement of tax of $12,666 for 1984 and $20,347 for 1985.

Respondent issued notices of transferee liability to Wiltzius and Waldorf on June 8, 1993. In the notices of liability, respondent determined that House of Babes failed to report gross receipts of $153,150 in 1984 and $200,620 in 1985.

OPINION

A. Transferee Liability

The Commissioner may collect unpaid income taxes of a transferor of assets from a transferee of those assets. Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. 39, 42 (1958); Stansbury v. Commissioner, 104 T.C. 486, 489 (1995), affd. 102 F.3d 1088 (10th Cir. 1996). Respondent contends that petitioners are liable as transferees for income tax and additions to tax owed by House of Babes for 1984 and 1985. Petitioners disagree.

Petitioners bear the burden of proving that House of Babes is not liable for tax and additions to tax. Sec. 6902(a). Petitioners concede that House of Babes is liable for the tax in the amounts determined by respondent.

Respondent bears the burden of proving that petitioners are liable as transferees. Sec. 6902(a); Rule 142(d); Gumm v.

Commissioner, 93 T.C. 475, 479-480 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991). State law generally determines the extent of a transferee's liability for the debts of a transferor. Commissioner v. Stern, supra at 45; Gumm v. Commissioner, supra. We apply Florida law in deciding whether petitioners are liable as transferees under section 6901 because all of the transfers occurred there. Fibel v. Commissioner, 44 T.C. 647, 657 (1965).

Under Florida law, one of the ways a transferee may be held liable for the debts of a transferor is if the transferor fraudulently conveys assets to the transferee; i.e., the transfer is made with actual or constructive intent to delay, hinder, or defraud the transferor's creditors and is made without adequate consideration. Fla. Stat. Ann. sec. 726.01 (West 1969);[2] Hagaman

----

[2]Fla. Stat. Ann. sec. 726.01 (West 1969) provides:

> Every * * * gift, grant, * * * conveyance, [or] transfer * * * and of goods and chattels, * * * by writing or otherwise, * * * which shall at any time hereafter be had, made or executed, contrived or devised of fraud, covin, collusion or guile, to the end, purpose or intent to delay, hinder or defraud creditors or others of their just and lawful actions, suits, debts, accounts, damages, demands, penalties or forfeitures, shall be from henceforth as against the person or persons * * * his, her or their successors, executors, administrators and assigns, and every one of them so intended to be delayed, hindered or defrauded,
> (continued...)

v. Commissioner, 100 T.C. 180, 184 (1993) (transferee liability established by applying Florida fraudulent conveyance law); Schad v. Commissioner, 87 T.C. 609, 614 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987); Advest, Inc. v. Rader, 743 F. Supp. 851, 854 (S.D. Fla. 1990); Bay View Estates Corp. v. Southerland, 154 So. 894, 900 (Fla. 1934); Stelle v. Dennis, 140 So. 194 (Fla. 1932); McKeown v. Allen, 20 So. 556 (Fla. 1896). The creditor must prove that the debtor intended to delay or hinder creditors at the time of the transfer. Bay View Estates Corp. v. Southerland, supra. The party seeking to prove that a conveyance was fraudulent has the burden of proof. Headley v. Pelham, 366 So. 2d 60, 63 (Fla. Dist. Ct. App. 1978); Scott v. Dansby, 334 So. 2d 331 (Fla. Dist. Ct. App. 1976).

---

[2](...continued)
deemed, held, adjudged and taken to be utterly void, frustrate and of none effect, any pretense, color, feigned consideration, expressing of use or any other matter or thing to the contrary notwithstanding; provided, that this section, or anything therein contained, shall not extend to any estate or interest in lands * * * [or] goods or chattels which shall be had, made, conveyed or assured if such estate shall be, upon good consideration and bona fide, lawfully conveyed or assured to any person or persons, or body politic or corporate, not having at the time of such conveyance or assurance to them made any manner of notice or knowledge of such covin, fraud, or collusion as aforesaid, anything in this section to the contrary notwithstanding.

There is a divergence of opinion under Florida law as to whether a creditor must prove that a conveyance was fraudulent by a preponderance of the evidence or by clear and convincing evidence.  See Wieczoreck v. H&H Builders, Inc., 450 So. 2d 867, 872 (Fla. Dist. Ct. App. 1984).  However, that issue does not affect our decision because we find that respondent has proven by clear and convincing evidence that the conveyance of assets from House of Babes to petitioners was fraudulent.

1.   Intent of the Transferor

Fraudulent intent may be established if a sufficient number of badges of fraud are present.  Advest, Inc. v. Rader, supra at 854; Johnson v. Dowell, 592 So. 2d 1194, 1197 (Fla. Dist. Ct. App. 1992); Wieczoreck v. H&H Builders, Inc., supra at 873; Banner Constr. Corp. v. Arnold, 128 So. 2d 893, 896 (Fla. Dist. Ct. App. 1961).  Badges of fraud under Florida law include:  (a) The transfer of all of the debtor's assets; (b) the existence of a close relationship between the transferor and transferee; (c) lack of consideration for the transfer; (d) the transfer of assets with knowledge of pending liability; and (e) the insolvency or substantial indebtedness of the transferor.  Eyler v. Commissioner, 760 F.2d 1129 (11th Cir. 1985), affg. in part and revg. in part T.C. Memo. 1983-397; United States v. Fernon,

640 F.2d 609, 613 (5th Cir. 1981); Harper v. United States, 769
F. Supp. 362, 367 (M.D. Fla. 1991); United States v. Ressler, 433
F. Supp. 459 (S.D. Fla. 1977), affd. 576 F.2d 650 (5th Cir.
1978); Cleveland Trust Co. v. Foster, 93 So. 2d 112, 114 (Fla.
1957).

### a.    Transfer of All of the Debtor's Assets

The parties stipulated, and we have found, that House of
Babes was liquidated in August 1986.  The liquidating
distribution occurred on August 14, 1986.

Petitioners contend that the $525,000 note from the buyer
was not distributed to House of Babes' shareholders in 1986.  We
disagree.  The buyer of House of Babes and House of Babes'
shareholders treated the note as belonging to the shareholders of
House of Babes because (at a time not stated in the record) the
buyer began to pay the interest on the note directly to House of
Babes' shareholders.[3]  We are not persuaded by petitioners'
contention that because House of Babes did not formally assign
assets to its shareholders, it had assets after August 1986.

Petitioners contend that House of Babes had assets after
August 1987 because the buyers sent a check to the IRS for Godby.

---

[3]Secrecy or concealment of a transfer is a badge of fraud in
Florida.  Cleveland Trust Co. v. Foster, 93 So. 2d 112, 114 (Fla.
1957).

We disagree. Kagen testified that the buyers received a letter from the IRS directing that a check be paid directly to the IRS on Godby's account. This does not show that House of Babes had assets.

Petitioners contend that under Fla. Stat. Ann. sec. 607.1405 (West 1993), House of Babes kept title to the note after Florida dissolved the corporation in 1987. We disagree. That section became effective July 1, 1990. 1989 Fla. Laws ch. 89-154, sec. 125.

> b. The Existence of a Close Relationship Between Transferor and Transferee

A conveyance is more likely to be fraudulent if there is a close relationship between the transferor and transferee. Scott v. Dansby, supra at 333; see Hagaman v. Commissioner, supra; Schad v. Commissioner, supra. There was a close relationship between House of Babes and petitioners. Petitioners owned and controlled House of Babes. Waldorf was a 32.5-percent shareholder and president, and Wiltzius was a 22.5-percent shareholder and signed documents as secretary for House of Babes.

Petitioners contend that respondent must prove that Wiltzius is an insider under Fla. Stat. Ann. sec. 726.106(2) (West 1988)

to establish a close relationship.[4]  We disagree.  That section was not in effect until January 1, 1988, which was after House of Babes was liquidated.  1987 Fla. Laws ch. 87-79, sec. 6; see Snellgrove v. Fogazzi, 616 So. 2d 527, 528 (Fla. Dist. Ct. App. 1993).

      c.    Inadequate Consideration

Under Florida law, a conveyance made without adequate consideration by a debtor is a badge of fraud.  Cleveland Trust Co. v. Foster, supra at 114; Money v. Powell, 139 So. 2d 702, 704 (Fla. Dist. Ct. App. 1962).  Petitioners contend that the liquidation of House of Babes was not a transfer of House of

---

[4]Fla. Stat. Ann. sec. 726.106(1) and (2) (West 1988) provides:

726.106.  Transfers fraudulent as to present creditors

(1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at the time or the debtor became insolvent as a result of the transfer or obligation.

(2)  A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at the time, and the insider had reasonable cause to believe that the debtor was insolvent.

Babes' assets without consideration because they gave up their stock in House of Babes. We disagree. After the liquidation, the shareholders had House of Babes' assets, and House of Babes was left with no ability to pay its debts.

Petitioners contend that, to show that House of Babes was insolvent, respondent must show that the liabilities of House of Babes exceeded its assets when petitioners exchanged their stock for the liquidating distribution. We disagree. House of Babes had no assets and no means of paying its debts after it was liquidated. No further accounting is required.

### d. Transfer of Assets With Knowledge of Pending Liability

A transfer of assets with knowledge of a pending liability is a badge of fraud. Cleveland Trust Co. v. Foster, supra at 114. Waldorf knew that House of Babes was liable for Federal corporate income tax when he sold its assets and it was liquidated. Wiltzius knew, or should have known, that House of Babes had a corporate tax liability when it was liquidated because he knew that the shareholders were skimming a large amount of gross receipts from House of Babes.

### e. Insolvency and Substantial Indebtedness

Under Florida law, a conveyance is more likely to be fraudulent if it made the debtor insolvent or if the transferor

was substantially indebted at the time of the transfer.  <u>United States v. Fernon</u>, <u>supra</u> at 613 n.10; <u>Bay View Estates Corp. v. Southerland</u>, 154 So. at 899; <u>Banner Constr. Corp. v. Arnold</u>, 128 So. 2d at 896.

House of Babes was insolvent after it was liquidated in August 1986 because it had no assets and no ability to pay its debts thereafter.

Petitioners contend that House of Babes was not insolvent because there is no evidence that it formally assigned the buyer's note to House of Babes' shareholders.  We disagree. The parties stipulated that House of Babes was liquidated in August 1986.  The liquidation occurred on August 14, 1986.  House of Babes had become liable for its 1984 and 1985 Federal income taxes by August 1986.  <u>Hagaman v. Commissioner</u>, 100 T.C. 180 (1993) (liable on last day of tax year).  Thus, House of Babes was substantially indebted when it transferred the note to its shareholders.  Even more basically, we have found, see par. A-1-a, above, that the shareholders treated the note as theirs and payment of the principal and interest on the note by the buyers to House of Babes' shareholders shows that the note was transferred to them; it is inescapable that after that transfer

House of Babes no longer had the note.  Thus, the transfer left House of Babes insolvent.

2.    Petitioners' Other Contentions

Petitioners contend that, as shareholders, they are entitled to a return of their capital in House of Babes even if respondent establishes that they are liable as transferees.  Petitioners offer no authority to support their claim.

Petitioners contend that respondent could have collected the tax liability from House of Babes.  We disagree.  The Commissioner is not required to try to collect from a transferor if it would be futile to do so.  Flynn v. Commissioner, 77 F.2d 180, 183 (5th Cir. 1935), affg. Cleveland v. Commissioner, 28 B.T.A. 578 (1933); City Natl. Bank v. Commissioner, 55 F.2d 1073, 1073-1074 (5th Cir. 1932), affg. National Bank of Commerce v. Commissioner, 19 B.T.A. 1080 (1930); Gumm v. Commissioner, 93 T.C. at 484; Kreps v. Commissioner, 42 T.C. 660, 671 (1964), affd. 351 F.2d 1 (2d Cir. 1965).  It would have been futile for respondent to try to collect from House of Babes after August 1986 because House of Babes had no assets and no means of generating income after August 1986.

Petitioners contend that respondent should have tried to collect House of Babes' tax liability from House of Babes in 1986

before the liquidation.  We disagree.  That was before the last return for the years in issue was due from House of Babes.  The Commissioner could assess tax for House of Babes' earliest taxable year in issue, 1984, at least until March 15, 1988, and beyond that if House of Babes committed fraud.

Petitioners contend that imposing transferee liability on them is unlawful double taxation.  We disagree.  Respondent is trying to collect House of Babes' taxes; no prohibited double taxation is present here.

Petitioners contend that section 6901(a)(1)(A) does not authorize respondent to collect an amount equal to 100 percent of the value of the property they received from House of Babes.  We disagree.  Respondent may collect the lesser of (1) the transferor's tax liability, including additions to tax and interest, or (2) the value of the assets the transferee received, plus interest.  Peterson v. Sims, 281 F.2d 577 (5th Cir. 1960); Mysse v. Commissioner, 57 T.C. 680, 703 (1972).

3.  Conclusion

We conclude from the badges of fraud that are present here that House of Babes fraudulently intended (through its shareholders) to transfer its assets to its shareholders with intent to delay payment of its creditors.  Harper v. United

States, 769 F. Supp. 362 (M.D. Fla. 1991); Advest, Inc. v. Rader, 743 F. Supp. at 854. We concluded above that House of Babes transferred its assets without adequate consideration. Thus, respondent has established that House of Babes made a fraudulent conveyance under Florida law.

B. Value of the Transferred Assets

1. Positions of the Parties

Petitioners received cash and an interest in the buyers' note proportionate to their interest in House of Babes. The parties dispute the value of the note.

Petitioners contend that Wiltzius' interest in the note (22.5 percent of $525,000 = $118,125) had a fair market value of $23,376.15 and that Waldorf's interest in the note (32.5 percent of $525,000 = $170,625) had a fair market value of $34,783. Respondent contends that the fair market value of each petitioner's interest in the note was his proportionate share of its full face value; i.e., $118,125 and $170,625.

The fair market value of property is the price at which it would change hands between a willing buyer and a willing seller, neither under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. United States v. Cartwright, 411 U.S. 546, 551 (1973); Estate of Hall v.

<u>Commissioner</u>, 92 T.C. 312, 335 (1989). The fair market value of a promissory note is a question of fact which depends on factors known or reasonably expected to exist on the valuation date. <u>Riss v. Commissioner</u>, 478 F.2d 1160 (8th Cir. 1973), affg. in part 56 T.C. 388 (1971); <u>Estate of Johnson v. Commissioner</u>, 77 T.C. 120, 124 (1982), revd. on other grounds 718 F.2d 1303 (5th Cir. 1983).

2.   <u>Expert Opinions</u>

Both parties relied on the opinions of experts. Expert witnesses' opinions may help the Court understand an area requiring specialized training, knowledge, or judgment. <u>Snyder v. Commissioner</u>, 93 T.C. 529, 534 (1989). We may be selective in deciding what part of an expert's opinion we will accept. <u>Helvering v. National Grocery Co.</u>, 304 U.S. 282, 295 (1938).

Petitioners relied on the expert testimony of Dr. Charles Brandon (Brandon). Brandon testified that the rate of discount for a note related to an adult entertainment business was substantial. Brandon based his estimate of fair market value in part on Waldorf's sale to Darlene Wiltzius.[5] Brandon assumed

[5]Respondent does not contend that we may not consider an actual sale of the asset at issue after the valuation date. <u>Estate of Kaplin v. Commissioner</u>, 748 F.2d 1109, 1111 (6th Cir. 1984), revg. T.C. Memo. 1982-440; <u>Estate of Spruill v.</u>

(continued...)

that Waldorf's sale of his share of the note to Darlene Wiltzius
was at arm's length and for fair market value.  We agree with
Brandon that the sale from Waldorf to Darlene Wiltzius was at
arm's length; however, we believe that Waldorf was under a
compulsion to sell.  Waldorf testified that he sold the note
because he owed creditors, he had no other income, the mortgage
on his house was about to be foreclosed, and he believed the IRS
would take the proceeds paid by the buyers on the note.  We
believe that Waldorf's sale to Darlene Wiltzius was a forced sale
for less than fair market value.

Brandon estimated the value of the $425,000 part of the
note; he did not consider the $100,000 payment.  He admitted at
trial that the $100,000 payment would increase the value of the
note but said that this effect was offset by a lack of payment
history.  We do not believe that factor fully offsets the fact
that Brandon did not consider the $100,000 payment.  We conclude
that Brandon underestimated the value of the note.

Respondent contends that the note is worth its face value.
Respondent relies on the expert testimony of Jack Shelton
(Shelton).  He did not consider the price paid in the arm's-

---

⁵(...continued)
Commissioner, 88 T.C. 1197, 1233 (1987).

length sale of Waldorf's interest to Darlene Wiltzius or any risks associated with the note. Shelton believed that repayment of the note had no more than average risk. We disagree; we believe that substantial risks were associated with the House of Babes note. We discount the note by 25 percent because of those risks.

Petitioners cited several cases in support of their position relating to the value of the note. Nothing in those cases leads us to alter our conclusions here. Although prior decisions can be helpful in deciding a valuation issue, we primarily decide the value of property based on the facts and circumstances of each case. Riss v. Commissioner, supra; Estate of Johnson v. Commissioner, supra.

3.   Conclusion

We conclude that Wiltzius and Waldorf are liable as transferees up to the value of the cash that they each received from the sale of the assets of House of Babes plus the value of the interest of each in the note. The value of Wiltzius' 22.5-percent share of the note is $88,593.75 ($118,125 x .75). The value of Waldorf's 32.5-percent share of the note is $127,968.75 ($170,625 x .75).

C.  Wiltzius' Plea Agreement

    1.  Wiltzius' Contentions

Wiltzius contends that his plea agreement (in which he pled guilty to filing a false income tax return for 1984 and 1985 and agreed to pay $11,329.94 in restitution) limited respondent's right to assert that he was liable as a transferee for House of Babes' income tax liability for 1984 and 1985.  He contends that his payment of restitution was intended to satisfy all taxes due from him for 1984 and 1985, including transferee liability.

    2.  Discussion

By its terms, the plea agreement does not limit Wiltzius' liability for tax.  At the trial of this case, Wiltzius asked his defense counsel from his criminal case if the restitution included transferee liability.  Wiltzius' criminal defense counsel said it did not.  He testified that transferee liability was not discussed as part of the plea bargain negotiations.  He said that Wiltzius' restitution was based on Wiltzius' individual personal income tax liability related to skimming from House of Babes.

Petitioners contend that the plea agreements show that Godby paid the IRS House of Babes' tax liability.  We disagree.  The

plea agreement requires Godby to pay restitution, but it does not state that his restitution was a payment of the tax of House of Babes.  Also, the record does not show whether Godby paid it.

Petitioners point out that Waldorf's and Godby's plea agreements referred to House of Babes' tax liabilities but Wiltzius' plea agreements did not.  Petitioners contend that this shows that the Government had no intention of pursuing transferee tax liability from Wiltzius.  We disagree.  The plea agreements do not limit Wiltzius' transferee liability for House of Babes income taxes for 1984 and 1985.

3.  Estoppel

Petitioners contend that res judicata, collateral estoppel, and equitable estoppel preclude respondent from asserting that they are liable as transferees of House of Babes' income tax liability because of their prior criminal cases.  Petitioners contend that the issues in both cases are identical because they involved the same act of skimming gross receipts from House of Babes.  We disagree.  Petitioners' criminal cases related to their individual income tax.  The criminal cases did not involve the claims that are at issue here.  The issue here is whether petitioners are liable as transferees for the taxes of House of

Babes.  Res judicata and collateral estoppel do not apply.  <u>Allen</u>
<u>v. McCurry</u>, 449 U.S. 90 (1980); <u>Montana v. United States</u>, 440
U.S. 147, 153 (1979); <u>Parklane Hosiery Co. v. Shore</u>, 439 U.S.
322, 326 n.5 (1979); <u>Commissioner v. Sunnen</u>, 333 U.S. 591, 597
(1948).

Equitable estoppel lies against the Government only in the
most extreme circumstances.  <u>OPM v. Richmond</u>, 496 U.S. 414, 424-
429 (1990); <u>Heckler v. Community Health Serv.</u>, 467 U.S. 51, 60
(1984); <u>Feldman v. Commissioner</u>, 20 F.3d 1128, 1134 (11th Cir.
1994), affg. T.C. Memo. 1993-17.  The party must, at a minimum,
demonstrate:  "'(1) words, acts, conduct or acquiescence causing
another to believe in the existence of a certain state of things;
(2) wilfulness or negligence with regard to the acts, conduct or
acquiescence; and (3) detrimental reliance by the other party
upon the state of things so indicated.'"  <u>Feldman v.</u>
<u>Commissioner</u>, <u>supra</u> (quoting <u>Bokum v. Commissioner</u>, 992 F.2d
1136, 1141 (11th Cir. 1993) (citations omitted), affg. T.C. Memo.
1990-21).  Petitioners have not done so.

Petitioners contend that they are entitled to equitable
relief to the extent that they already paid taxes.  However, they

have not shown that they paid House of Babes' taxes for 1984 and 1985.

We conclude that Wiltzius' plea agreement does not eliminate his liability as a transferee.

D. Whether the Statute of Limitations Bars Respondent from Assessing Transferee Tax Liability

Petitioners contend that the statututory period of limitations bars respondent from assessing transferee tax liability against them. We disagree.

The Commissioner may assess liability of an initial transferee within 1 year after the period to assess tax against the transferor expires. Sec. 6901(c)(1). Tax may be assessed at any time if the return is false or fraudulent. Sec. 6501(c)(1). Respondent determined that House of Babes filed false returns for 1984 and 1985 and that the addition to tax for fraud applied. House of Babes' 1984 and 1985 returns were fraudulent because it intentionally did not report about 50 percent of the weekday gross receipts. Thus, there is no time limit for respondent to determine a deficiency against House of Babes or its transferees. Sec. 6501(c)(1); Pert v. Commissioner, 105 T.C. 370, 378-379 (1995).

Petitioners contend that the Florida statututory period of limitations on fraudulent conveyances precludes respondent from asserting transferee liability here.  We disagree.  The Commissioner is bound by Federal rather than State statututory periods of limitations.  United States v. Summerlin, 310 U.S. 414, 416 (1940); United States v. Fernon, 640 F.2d at 612 (U.S. Government sought to collect tax by applying Florida fraudulent conveyance law).

To reflect the foregoing and concessions,

Decisions will be

entered under Rule 155.